UNITED STATES of America

v.

Valdik Aleksandrovich ENGER and
Rudolf Petrovich Chernyayev,
Defendants.

Crim. No. 78–149.

United States District Court,
D. New Jersey.

Aug. 8, 1978.

On Motion for Reconsideration
Aug. 25, 1978.

494

Robert J. Del Tufo, U. S. Atty., Edward J. Plaza, Asst. U. S. Atty., Newark, N. J., for plaintiff.

Martin Popper, Donald N. Ruby, Wolf, Popper, Ross, Wolf & Jones, New York City, for defendants.

## MEMORANDUM OPINION

LACEY, District Judge.

The defendants, citizens of the Union of Soviet Socialist Republics, are charged in a three-count indictment with conspiracy to violate 18 U.S.C. §§ 793(g) and 793(a) and aiding and abetting in violation of 18 U.S.C. §§ 793(b) and 2.[1] They are now before the

---

1. 18 U.S.C. § 793(a) states in pertinent part:

Whoever, for the purpose of obtaining information respecting the national defense with intent or reason to believe that the information is to be used to the injury of the United States, or to the advantage of any foreign nation, goes upon, enters, flies over, or otherwise obtains information concerning any vessel, aircraft, work of defense, navy yard, naval station, submarine base, fueling station, fort, battery, torpedo station, dockyard, canal, railroad, arsenal, camp, factory, mine, telegraph, telephone, wireless, or signal station, building office, research laboratory

court on a variety of motions, which I shall consider in the order in which they are raised by the defendants' memorandum of law.

### I.

The defendants have moved for dismissal of the indictment, contending they are entitled to the protection of diplomatic immunity.

The factual predicate for the defendants' claim of immunity rests primarily on letters submitted to the court on behalf of the defendants by the U.S.S.R. Ambassador to the United States, Hon. Anatoly F. Dobrynin, and Hon. Erik Suy, Legal Counsel to the United Nations. Defendants themselves have filed no affidavits in their own name. Hence there are here lacking facts explaining why their United Nations vocations required their presence in New Jersey, or a contention by the defendants that they were not in New Jersey at the times alleged by the United States.

Ambassador Dobrynin's letters, attached as Exhibit A to the defendants' notice of motion, are formal claims of immunity by the U.S.S.R. An identical claim of immunity is made for each of the defendants. The following is the complete text of each letter:

> or station or other place connected with the national defense owned or constructed, or in progress of construction by the United States or under the control of the United States, or of any of its officers, departments, or agencies, or within the exclusive jurisdiction of the United States, or any place in which any vessel, aircraft, arms, munitions, or other materials or instruments for use in time of war are being made, prepared, repaired, stored, or are the subject of research or development, under any contract or agreement with the United States, or any department or agency thereof, or with any person on behalf of the United States, or otherwise on behalf of the United States, or any prohibited place so designated by the President by proclamation in time of war or in case of national emergency in which anything for the use of the Army, Navy, or Air Force is being prepared or constructed or stored, information as to which prohibited place the President has determined would be prejudicial to the national defense . . . .
>
> 18 U.S.C. § 793(b) states in pertinent part:

### CLAIM OF DIPLOMATIC IMMUNITY

I, Anatoly F. Dobrynin, Ambassador of the Union of Soviet Socialist Republics to the United States of America, hereby have the honor to draw your attention to the fact that the Soviet Citizen Rudolf Petrovich Chernyayev has a diplomatic rank of Second Secretary conferred on him in accordance with the provisions based on the decree of the Presidium of the U.S.S.R. Supreme Soviet of May 28, 1943.

The Government of the Soviet Union made available the services of Mr. Chernyayev as an Administrative Officer in the United Nations Secretariat, and Nr. Chernyayev accepted this post with the knowledge and consent of the Government of the Soviet Union.

Mr. Chernyayev arrived in the United States in May, 1974, having a Soviet diplomatic passport no. 015793 and since that time has been attached to the Secretariat of the United Nations.

The Secretariat of the United Nations at all these times had knowledge of the fact that Mr. Chernyayev retained and retains at the present time his diplomatic rank.

> Whoever, for the purpose aforesaid, and with like intent or reason to believe, copies, takes, makes, or obtains, or attempts to copy, take, make, or obtain, any sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, document, writing, or note of anything connected with the national defense . . . .
>
> 18 U.S.C. § 793(g) states in pertinent part:
>
> If two or more persons conspire to violate any of the foregoing provisions of this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy.
>
> 18 U.S.C. § 2 states:
>
> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
>
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

I hereby, in the name of the Government of the Union of Soviet Socialist Republics and in conformity with the applicable principles of international law claim immunity from arrest and prosecution on behalf of Rudolf Petrovich Chernyayev and respectfully request that the Indictment against him be dismissed.

Anatoly F. Dobrynin (signature)
Anatoly F. Dobrynin,
Ambassador

## CLAIM OF DIPLOMATIC IMMUNITY

I, Anatoly F. Dobrynin, Ambassador of the Union of Soviet Socialist Republics to the United States of America, hereby have the honor to draw your attention to the fact that the Soviet Citizen Valdik Aleksandrovich Enger has a diplomatic rank of Second Secretary conferred on him in accordance with the provisions based on the decree of the Presidium of the U.S.S.R. Supreme Soviet of May 28, 1943.

The Government of the Soviet Union made available the services of Mr. Enger in the office of Political and Security Affairs at the United Nations Secretariat, and Mr. Enger accepted this post with the knowledge and consent of the Government of the Soviet Union.

Mr. Enger arrived in the United States in December 1973 having a Soviet diplomatic passport no. 012841 and since that time has been attached to the Secretariat of the United Nations.

The Secretariat of the United Nations at all these times had knowledge of the fact that Mr. Enger retained and retains at the present time his diplomatic rank.

I hereby, in the name of the Government of the Union of Soviet Socialist Republics and in conformity with the applicable principles of international law claim immunity from arrest and prosecution on behalf of Valdik Aleksandrovich Enger and respectfully request that the Indictment against him be dismissed.

Anatoly F. Dobrynin (signature)
Anatoly F. Dobrynin,
Ambassador

The Dobrynin letters do not contend that either defendant is, or at any material time was, duly designated by the U.S.S.R. to serve as its representative to the United Nations, that either is or was on the staff of the U.S.S.R. delegation to the United Nations, or that either ever performed or was ever assigned to perform any diplomatic duties on behalf of the U.S.S.R. in its relations with the United States (or any other government) while residing in this country. Instead, the letters do not go beyond stating that the defendants, from the time of their separate arrivals in the United States from the U.S.S.R., have been "attached to the Secretariat of the United Nations," while retaining their diplomatic ranks as conferred on them by their government.

The nature of their employment with the United Nations is set forth in the letter of The Legal Counsel to the United Nations, dated June 23, 1978, attached as Exhibit B to the defendants' notice of motion. The following is the full text of Mr. Suy's letter:

I wish to refer to your request for certain information regarding two officials of the United Nations Secretariat, Mr. Valdik Enger and Mr. Rudolf Chernjaev (sic).

I understand your request to relate to the officials' titles and functions, as well as to their official status, within the United Nations Secretariat.

In respect of Mr. Enger, I wish to inform you that his title is "Political Affairs Officer", and that his grade is P–4. For your information I recall that the ranks of the Secretariat's professional staff is as follows in descending order:

Secretary-General

Under-Secretary-General

Assistant Secretary-General

Director 2

Director 1

Professional 5

Professional 4

Professional 3

Professional 2

Professional 1

In addition there are other categories of staff, generally of lower rank, such as general service staff, manual workers and guards.

As far as Mr. Enger's functions are concerned, I wish to advise that he was appointed a member of the Unit for Co-ordination and Political Information, Office of the Under-Secretary-General for Political and Security Council Affairs. A comprehensive description of the responsibilities and functions of that unit is set out in the relevant part of the Secretary-General's bulletin concerning the organization of the Secretariat, namely ST/SGB/Organization, Section I (and Amendment 1), Department of Political and Security Council Affairs, a copy of which is enclosed.

In respect of Mr. Chernjaev (sic) I wish to inform you that his title is "Administrative Officer", and that his grade is P–3. He was appointed a member of the Training and Examinations Service, Office of Personnel Services. A comprehensive description of the responsibilities and functions of the Training and Examinations Service is contained in the relevant part of the Secretary-General's bulletin on the organization of the Secretariat namely, ST/SGB/Organization, Section P(II), Office of Personnel Services, a copy of which is enclosed.

As far as the present employment status of Mr. Enger and Mr. Chernjaev (sic) is concerned, I wish to advise that pending the action against them in the United States District Court for New Jersey they are placed on special leave with full pay, but that they remain officials of the Secretariat.

Sincerely,

Erik Suy (signature)

Erik Suy

The Legal Counsel

The attachments to the Suy letter indicate that the responsibilities of the defendants, in their employment with the United Nations, include the following.

The defendant Enger is a Political Affairs Officer attached to the Unit for Coordination and Political Information, Office of the Undersecretary General for Political Information. The responsibilities of the Department of Political and Security Counsel Affairs are described, as follows: .

Provides secretariat services for the Security Council and its subsidiary bodies, including the Committee established in pursuance of Security Council resolution 253 (1968), the Committee of Admission of New Members, the Military Staff Committee, the Committee on Council Meetings away from Headquarters, the *Ad Hoc* Sub-Committee on Namibia, and for the First Committee and the Special Political Committee of the General Assembly and other General Assembly committees and bodies concerned with matters relating to the maintenance of international peace and security;

Provides secretariat services for the Conference of the Committee on Disarmament;

Follows, in accordance with Article 54 of the Charter, the activities of regional agencies pertaining to the maintenance of international peace and security;

Assists the Secretary-General in the discharge of his political responsibilities under the Charter and in pursuance of resolutions of United Nations organs.

The functions of the Unit for Coordination are described, as follows:

Assists in departmental co-ordination, programme planning and monitoring and evaluation of plan implementation;

Maintains relations with regional organizations, with the Office for Inter-Agency Affairs and Co-ordination and other units of the Secretariat and with the United Nations Institute for Training and Research and follows activities on non-governmental organizations relating to political questions;

Participates in sessions of the Preparatory Committee of the Administrative Committee on Co-ordination and arranges for the Department's representation at conferences, etc.

The defendant Chernyayev, as an Administrative Officer, is a member of the Train-

ing and Examination Service, Office of Personnel Services. The functions of the Office of Personnel Services are described, as follows:

Recruits the staff of the Secretariat and of subsidiary organs of the United Nations;

Administers the staff of the United Nations, directly and through instructions issued to other units of the Secretariat;

Formulates and applies the personnel policy of the United Nations;

Co-operates with specialized agencies and the International Atomic Energy Agency with a view of developing common personnel policies;

Provides documentation on personnel matters for the Fifth Committee of the General Assembly;

Provides secretariat services and documentation for the joint administrative bodies dealing with personnel matters.

The functions of the Training and Examination Service are described, as follows:

Coordinates, evaluates and reviews the training activities of the Secretariat;

Advises and assists in the identification of the administrative and management training needs of the Secretariat and makes proposals in consultation with Staff Services for appropriate training programmes;

Plans and organizes orientation programmes and secretarial supervisory and managerial training;

Plans and organizes the professional studies programme;

Plans and organizes the language training programmes of the Organization;

Plans and administers all examinations for the award of language proficiency certificates and for language allowances;

Administers the Russian language and interpreter training programmes in Moscow and liaises with the Inter-Agency Interpreter trainee programme in Geneva;

Organizes, co-ordinates and administers competitive examinations for recruitment to posts with professional requirements and to posts with special language requirements at all duty stations and tests for recruitment to all clerical and secretarial posts at Headquarters.

The defendants rely in part, as noted in their memorandum of law, on the contention that they hold diplomatic passports issued by the U.S.S.R. Such passports do not appear of record; neither have the defendants submitted affidavits to establish their existence. The United States, however, has submitted the affidavit of United States Foreign Service Officer James Alexander Smith to establish that both defendants Enger and Chernyayev were, at the time of their arrest, holders of valid G–4 visas. In addition, the United States has submitted visa applications made by the defendants. Since the defendants rely on the fact that they have diplomatic rank, it is in the interest of justice that I consider their effect on the defendants' status for purposes of their immunity claim. Therefore, I will treat it as established that the defendants indeed held such passports.

Defendants' claim of immunity is based solely upon "principles of international law." Defendants' Memorandum of Law in Support of Defendants' Motions, 2. They emphasize that they do "not claim immunity as diplomats accredited to the United States . . . ." Defendants' Reply Memorandum of Law in Support of Defendants' Motions, 2. Instead, they claim "that they are diplomats who are present and functioning in this country as diplomats." *Id.* The argument, it appears, is that the defendants are diplomats *de facto,* if not *de jure,* and thus are entitled to the perquisites of diplomatic status, including immunity from arrest and prosecution.

Their procedural course was wisely chosen. Their conceded lack of accreditation to the United States [2] prohibits them from in-

---

**2.** The Dobelle affidavits establish that neither defendant has ever been notified to the United States as other than employees "of the United Nations Secretariat, entitled to the privileges and immunities granted by Sections 288–288f–2 of title 22 and Section 18(a) of the

voking our statutes and binding treaties pursuant to which our nation confers privileges and immunities upon specified classes of foreign representatives. To understand the claim that is made, it is first necessary to discuss these statutory and treaty provisions.

The general diplomatic immunity statute, 22 U.S.C. § 252, reads in pertinent part:

Whenever any writ or process is sued out or prosecuted by any person in any court of the United States . . . whereby the person of any ambassador or public minister of any foreign prince or State, authorized and received as such by President . . . is arrested or imprisoned . . . such writ or process shall be deemed void.

The word "minister," as used in the above statute, is given a functional definition by 22 U.S.C. § 178, which states:

The word "minister," when used in sections . . . 251–258 . . . of this title . . . shall be understood to mean the person invested with, and exercising, the principal diplomatic functions. . . .

The United States has submitted authenticated certificates of State Department officials stating:

TO WHOM IT MAY CONCERN:

This is to certify that I, Edith J. Dobelle, Chief of Protocol, United States Department of State, am responsible for registering and maintaining the records of the Department of State concerning the official status of officers and employees of foreign governments in the United States who are entitled to diplomatic immunity pursuant to Sections 252–254 of title 22 of the United States Code of the Agreement between the United States and the United Nations concerning the Headquarters of the United Nations, June 26, 1947, 61 Stat. 3416, TIAS 1676. I am also responsible for registering and maintaining the records of the Department of State concerning the official status of representatives in or to international organizations, and officers and employees of such organizations, entitled to the privileges, exemptions and immunities granted by Sections 288–288f–2 of title 22 of the United States Code or the Convention of Privileges and Immunities of the United Nations, 21 U.S.T. 1418, TIAS 6900.

I further certify that such records are maintained under my custody in the District of Columbia.

I have caused diligent search to be made of such records and have found no record which would indicate that Valdik A. Enger, a Soviet national employed by the United Nations Secretariat, is notified to and recognized by the Department of State in any capacity which would entitle him to diplomatic immunity pursuant to the above-mentioned Sections 252–254 of title 22 of the United States Code.

I further certify that records in my custody do not reflect that Mr. Enger is, or ever has been, the principal resident representative of a Member of the United Nations under Section 15(1) of the Headquarters Agreement, or that his name was ever notified to or accepted by the Department of State as a member of the staff of such a representative under Section 15(2) of that agreement.

I further certify that the only records in the Department of State regarding the official status of the said Mr. Enger list him as an employee of the United Nations Secretariat, entitled to the privileges and immunities granted by Sections 288–288f–2 of title 22 of the United States Code and Section 18(a) of the Convention on Privileges and Immunities of the United Nations, 21 U.S.T. 1418, TIAS 6900.

Edith J. Dobelle (signature)
Edith J. Dobelle
Chief of Protocol

Department of State,

Washington, July 7, 1978

Certification (Government Exhibit A–1)

Convention on Privileges and Immunities of the United Nations, 21 U.S.T. 1418, TIAS 6900."

See also *United States v. Dizdar*, 581 F.2d 1031, 1033–36 (2d Cir. 1978).

TO WHOM IT MAY CONCERN:

This is to certify that I, Edith J. Dobelle, Chief of Protocol, United States Department of State, am responsible for registering and maintaining the records of the Department of State concerning the official status of officers and employees of foreign governments in the United States who are entitled to diplomatic immunity pursuant to Sections 252–254 of title 22 of the United States Code or the Agreement between the United States and the United Nations concerning the Headquarters of the United Nations, June 26, 1947, 61 Stat. 3416, TIAS 1676. I am also responsible for registering and maintaining the records of the Department of State concerning the official status of representatives in or to international organizations, and officers and employees of such organizations, entitled to the privileges, exemptions and immunities granted by Sections 288–288f–2 of title 22 of the United States Code or the Convention of Privileges and Immunities of the United Nations, 21 U.S.T. 1418, TIAS 6900.

I further certify that such records are maintained under my custody in the District of Columbia.

I have caused diligent search to be made of such records and have found no record which would indicate that Rudolf Chernyayev, a Soviet national employed by the United Nations Secretariat, is notified to and recognized by the Department of State in any capacity which would entitle him to diplomatic immunity pursuant to the above-mentioned Sections 252–254 of title 22 of the United States Code.

I further certify that records in my custody do not reflect that Mr. Chernyayev is, or ever has been, the principal resident representative of a Member of the United Nations under Section 15(1) of the Headquarters Agreement, or that his name was ever notified to or accepted by the Department of State as a member of the staff of such a representative under Section 15(2) of that agreement.

I further certify that the only records in the Department of State regarding the official status of the said Mr. Chernyayev list him as an employee of the United Nations Secretariat, entitled to the privileges and immunities granted by Sections 288–288f–2 of title 22 of the United States Code and Section 18(a) of the Convention on Privileges and Immunities of the United Nations, 21 U.S.T. 1418, TIAS 6900.

Edith J. Dobelle (signature)
Edith J. Dobelle
Chief of Protocol

Department of State

Washington, July 7, 1978

Certification (Government Exhibit A–2)

■ These certificates conclusively establish that the defendants are not ministers within the statutory definition and thus are not entitled to the protection of 22 U.S.C. § 252.

■ For the same reason the defendants may not avail themselves of the Immunity provisions of the Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes [Vienna Convention], to which the United States is a signatory. Article 29 of the Vienna Convention provides:

The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity.

23 U.S.T. 3227.

Article 31 of the Vienna Convention provides: "A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State." A "diplomatic agent" is defined by Article 1(e) as "the head of the mission or a member of the diplomatic staff of the mission," while the "diplomatic staff" consists of the "members of the mission having diplomatic rank." Article 1(d). No definition of "mission" is offered, but the functional description of its duties in Article 3 convinces me that the services performed by the defendants were not per-

formed for or as members of the U.S.S.R. mission to the United States or the United Nations.[3] Even if they were members of the mission, the foregoing certificates of the State Department demonstrate that the defendants did not have diplomatic status in the eyes of the United States.

Special statutory provision is made for immunity for employees of international organizations in the United States by the International Organization Immunities Act, 22 U.S.C. § 288 *et seq.* The statute provides, in pertinent part:

> For the purposes of this title, the term "international organization" means a public international organization in which the United States participates pursuant to any treaty or under the authority of any Act of Congress authorizing such participation or making an appropriation for such participation, and which shall have been designated by the President through appropriate Executive order as being entitled to enjoy the privileges, exemptions, and immunities provided in [said section.]

22 U.S.C. § 288.

\* \* \* \* \* \*

> (a) Persons designated by foreign governments to serve as their representatives in or to international organizations and the officers and employees of such organizations, and members of the immediate families of such representatives, officers, and employees residing with them, other than nationals of the United States, shall, insofar as concerns laws regulating entry into and departure from the United States, alien registration and fingerprinting, and the registration of foreign agents, be entitled to the same privileges,

exemptions, and immunities as are accorded under similar circumstances to officers and employees, respectively, of foreign governments and members of their families.

> (b) Representatives of foreign governments in or to international organizations and officers and employees of such organizations *shall be immune from suit and legal process relating to acts performed by them in their official capacity and falling within their functions as such representatives, officers, or employees* except insofar as such immunity may be waived by the foreign government or international organization concerned. (Emphasis added)

22 U.S.C. § 288d.

> (a) No person shall be entitled to the benefits of [sections 228–288f] of this title unless he (1) shall have been duly notified to and accepted by the Secretary of State as a representative, officer, or employee; or (2) shall have been designated by the Secretary of State, prior to formal notification and acceptance, as a prospective representative, officer, or employee; or (3) is a member of the family or suite, or servant, or one of the foregoing accepted or designated representatives, officers, or employees.

\* \* \* \* \* \*

> (c) No person shall, by reason of the provisions of [said sections], be considered as receiving diplomatic status or as receiving any of the privileges incident thereto other than such as are specifically set forth herein.

22 U.S.C. § 288e.

The United Nations has been appropriately designated as such an international

---

**3.** Article 3 reads as follows:

1. The functions of a diplomatic mission consist *inter alia* in:

(a) representing the sending State in the receiving State;

(b) protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;

(c) negotiating with the Government of the receiving State;

(d) ascertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State;

(e) promoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations.

2. Nothing in the present Convention shall be construed as preventing the performance of consular functions by a diplomatic mission.

organization. Executive Order No. 9698 (February 19, 1946), 11 Fed.Reg. 1809, as amended by Executive Order No. 10083 (1949).

Neither the defendants' Memorandum nor Reply Memorandum explicitly raises the foregoing statute as a basis for immunity. In the event, however, that the defendants' heavy reliance on their job descriptions is intended to raise the protection of the statute implicitly, it is appropriate that I analyze the International Organization Immunities Act in that light.

■ While employees of international organizations are provided with a broad-based immunity from laws regulating entry into and departure from the United States, 22 U.S.C. § 288d(a), Congress adopted a functional criterion to govern the scope of immunity in other situations, namely, that such employees "shall be immune from suit and legal process relating to acts performed by them *in their official capacity and falling within their* [official] *functions . . .*" 22 U.S.C. § 288d(b) (emphasis added). Espionage, the crime with which the defendants are charged, is, of course, not one of the functions performed in the defendants' official capacities with the United Nations.[4]

*United States v. Egorov*, 222 F.Supp. 106 (E.D.N.Y.1963), is instructive. Egorov, charged with violating 18 U.S.C. § 794(c), raised virtually the same claims of immunity as the defendants raise here, including employment with the United Nations Secretariat. As to Egorov's contention that he was immunized from prosecution by 22 U.S.C. § 288d(b), the court noted:

> Egorov, as hereinabove stated, was an employee of the United Nations, from which he received his compensation for services rendered. His duties and functions were entirely non-diplomatic in character. *Employees* of the United Nations are separate and distinct from persons designated by foreign governments to serve *as their foreign representatives* in or to the United Nations. *United States v. Melekh, supra.* His duties and functions in the Personnel Section of the United Nations did not, of course, contemplate or include such acts as those charged in the indictment herein. (Emphasis in original).

*Id.* at 108.[5] *Accord, United States v. Melekh,* 190 F.Supp. 67, 79–80 (S.D.N.Y.1960); *United States v. Coplon,* 84 F.Supp. 472, 474 (S.D.N.Y.1949) [*Coplon I*]. *And see Mpiliris v. Hellenic Lines, Ltd.,* 323 F.Supp. 865, 882–83 (S.D.Tex.1969), *aff'd,* 440 F.2d 1163 (5th Cir. 1971).

*See also* Ling, *A Comparative Study of the Privileges and Immunities of United Nations Member Representatives and Officials with the Traditional Privileges and Immunities of Diplomatic Agents,* 33 Wash. & Lee L.Rev. 91 (1976):

> The exemptions and immunities of United Nations officials in the United States, as stipulated by the terms of the United

---

**4.** For the same reason the immunity provisions of the United Nations Charter are inapplicable. Article 105 of the Charter provides:

> 2. Representatives of the Members of the United Nations and officials of the Organization shall similarly enjoy such privileges and immunities as are necessary for the independent exercise of their function in connection with the Organization.

59 Stat. 1031, 1053.

It is evident that the standard here, immunity coextensive with functional necessity, is congruent with that of 22 U.S.C. § 288d(b).

Article 105 adopted what is known as the "functional necessity theory" as the legal basis for granting privileges and immunities to the United Nations, its representatives, and its officials, that is, the extent of privileges and immunities to be granted are defined by the limits of the function served by each such individual. *But see* Garretson, The Immunities of Representatives of Foreign States, 41 N.Y.U.L.Rev. 67, 70 (1966).

Moreover, the indictment is specific in its averments, placing the defendants in New Jersey on numerous occasions. As has been noted, the defendants have not filed any affidavits in support of their motions, and nothing has been offered by them to indicate that their United Nations duties required them to be in New Jersey on so many occasions, or, in the alternative, denying they were present in New Jersey as alleged in the indictment.

**5.** Egorov was also a U.S.S.R. national. Defendants and their principals can hardly complain of the view taken by me of their status, alerted as they were by *Egorov.*

Nations Charter and the General Convention, are designed solely to protect the independence of officials in their United Nations functions. No exemption from local jurisdiction is provided officials for acts in their private capacity. (Footnote omitted).

*Id.* at 138.

As Ling also points out: "[I]t is the work rather than the official which is protected," with the result that such officials "must obey all ordinary laws governing their private actions." *Id.* at 129.

There is, as well, a practical justification based on the legitimate self-interest of the United States. The fact that the United Nations has its headquarters in the United States requires a large number of foreign government representatives and foreign national employees to reside in the New York City area for substantial periods of time. From the standpoint of providing diplomatic immunity, it would be impractical for all concerned if each of those individuals had to be "approved" by the United States in advance. The accommodation reached is not to afford all such foreign nationals full immunity status. Rather, it is to permit the foreign government or international organization to undertake the selection of representatives and employees but, as a means of protecting this country's interests, to limit the availability and scope of immunity. Accordingly, under the Headquarters Agreement[6] and 22 U.S.C. § 288d(b), only a limited number of persons may receive full immunity and then only after prior government approval; all others are cloaked with immunity only when acting within the scope of their employment. As stated in *United States ex rel. Casanova v. Fitzpatrick,* 214 F.Supp. 425, 437 (S.D.N.Y.1963), a contrary approach would lead to the untenable result that:

a member state of the United Nations which may be hostile to our interests [would be] free to send to the United States individuals designated as resident members of their staffs, to engage in conduct destructive of our national interest and security and yet have them protected from criminal prosecution on the theory that their designated status cloaked them with diplomatic immunity. It would open the flood gates for the entry of saboteurs, agents provocateur and others under a built-in guarantee that no matter what the criminal conduct, the Government would not prosecute them.[7]

**6.** The Headquarters Agreement entered into between the United Nations and the United States as the host government, 61 Stat. 756, provides the following grant of immunity.

(1) Every person designated by a Member as the principal resident representative to the United Nations of such Member or as a resident representative with the rank of ambassador or minister plenipotentiary,

(2) such resident members of their staffs as may be agreed upon between the Secretary-General, the Government of the United States and the Government of the Member concerned,

(3) every person designated by a Member of a specialized agency, as defined in Article 57, paragraph 2, of the Charter, as its principal resident representative, with the rank of ambassador or minister plenipotentiary, at the headquarters of such agency in the United States, and

(4) such other principal resident representatives of members to a specialized agency and such resident members of the staffs of representatives to a specialized agency as may be agreed upon between the principal executive officer of the specialized agency, the Government of the United States and the Government of the Member concerned,

shall, whether residing inside or outside the headquarters district, be entitled in the territory of the United States to the same privileges and immunities, subject to corresponding conditions and obligations, as it accords to diplomatic envoys accredited to it. In the case of Members whose governments are not recognized by the United States, such privileges and immunities need be extended to such representatives, or persons on the staffs of such representatives, only within the headquarters district, at their residences and offices outside the district, in transit between the district and such residences and offices, and in transit on official business to or from foreign countries.

At this point it need hardly be repeated that the defendants do not fall within any of the groups permitted to invoke the immunity provided by the Agreement.

**7.** This is precisely the weakness of the position taken by the defendants here. Were I to find the defendants immune from prosecution, it

Thus, since the defendants do not fall under any of the statutory or treaty provisions for immunity, it remains only to inquire whether they are protected by an immunity derived from general principles of international law which are not codified elsewhere.[8]

■ Diplomatic immunity in its contemporary aspect may be broadly defined as the freedom from local jurisdiction accorded under principles of international law by the receiving state to the duly accredited diplomatic representatives of other states. *See* Bishop, *International Law* at 447 (1953); Hall, *Treatise on International Law* at 223 (8th ed. 1924).

■ The modern law of diplomatic immunity is derived from centuries of practical dealings among nations. The United States has long recognized the responsibilities imposed upon individual nations by force of international custom and treats the Law of Nations as the law of the land. *Kansas v. Colorado,* 206 U.S. 46, 97, 27 S.Ct. 655, 51 L.Ed. 956 (1907). That this is so is well illustrated by the frequently cited letter (of March 16, 1906) of then Secretary of State Elihu Root:

> There are many and varied reasons why diplomatic agents, whether accredited or not to the United States, should be exempt from the operation of the municipal law at [sic] this country. The first and fundamental reason is the fact that diplomatic agents are universally exempt by well recognized usage incorporated into the Common law of nations, and this nation, bound as it is to observe International Law in its municipal as well as its

foreign policy, cannot, if it would, vary a law common to all.

*See* IV Hackworth, *Digest of International Law,* § 400 at 513 (1942). The rule's rationale is a practical one: "that Governments may not be hampered in their foreign relations by the arrest or forcible prevention of the exercise of a duty in the person of a governmental agent or representative." *Id.*

> Diplomatic immunities are required on the ground of practical necessity. . . . It is in the interest of the State accrediting a diplomatic agent, and in the long run in the interest also of the State to which he is accredited, that he should have such liberty as will enable him, at all times and in all circumstances, to conduct the business with which he is charged; and liberty to this extent is incompatible with full subjection to the jurisdiction of the country with the government of which he negotiates.

Hall, *supra* at 218–19. The courts have recognized this policy. *Hellenic Lines, Ltd. v. Moore,* 120 U.S.App.D.C. 288, 290, 345 F.2d 978, 980 (1965); *United States ex rel. Casanova v. Fitzpatrick, supra* at 428; *Restatement, Second,* Foreign Relations Law of the United States § 73, comment *a.*

The peculiar requirements of intercourse among nations have long been recognized. Part and parcel of the system developed for meeting these requirements is diplomatic immunity, the fundamental principles of which trace their roots to ancient China, India, and Egypt.[9] The ancient Greeks, as the first to regularize diplomatic relations, included in their practice the exchange of ambassadors and concomitant personal in-

would be a simple matter in subsequent cases for hostile governments to confer diplomatic rank on its intelligence agents and install them as lower-echelon employees of international organizations based in the United States, secure in the knowledge that if their illegal activities were discovered they could not be prosecuted.

**8.** The defendants' claim is not aided by the fact that while there is general agreement among nations on the proper scope of diplomatic immunity, as of this date the law of the United States affords foreign diplomats somewhat greater protection than do the laws of many

other nations. This state of affairs has been subjected to substantial criticism and legislative efforts at amendment. *See* Hearings before Subcommittee on International Relations, House Committee on International Relations, May 17–June 16, 1977, at 1–5.

**9.** For example, a treaty negotiated between the Hittites and Ramses II of Egypt included provision for diplomatic privileges and immunities. Plischke, Conduct of American Diplomacy at 3 (3d ed. 1959).

violability.[10] Thus, it can be said that the fundamental principles of modern diplomatic immunity were in active use 2,000 years ago. Their use has been continuous since that time.[11]

It was not until the end of the Middle Ages, however, that diplomacy truly began to be practiced as it is today.[12] By the end of the 17th century broad principles of diplomatic relations were recognized as matters of customary practice, though still subject to the exigencies of politics.[13] International treaties on the subject dealt with the accreditation of representatives in particular cases and had not yet advanced to the point of regulating the details of their treatment.[14]

In more recent times the law of diplomatic immunity has been codified by the Vienna Convention, the principal effect of which is to codify the customary law of diplomatic relations, including the law of diplomatic immunity.[15]

The Vienna Convention may be traced indirectly to an action of the League of Nations appointing a "Committee of Experts for the Progressive Codification of International Law." The Committee named diplomatic immunity as an area appropriate for codification due to: (1) its essentially procedural character; (2) the stability of the practices and procedures of embassies; (3) the fact that it is sanctioned by a high degree of reciprocity among nations; and (4) its familiarity to the international community from long practice and extensive academic discussion.[16]

In 1954 the International Law Commission, acting pursuant to a resolution of the United Nations General Assembly, instituted work on a codification of the law of diplomatic intercourse and immunities. Pursuant to invitation by the General Assembly, 81 nations convened a conference at Vienna on March 2, 1961. The convention which grew out of that conference was signed on April 18, 1961, and entered into force on April 24, 1964, when it was ratified by 22 nations. As noted above, the Vienna Convention codified the customary law of diplomatic relations in existence since ancient times. In addition, it resolved many of the inconsistencies of State practice, including those relating to the scope of immunities and the persons to whom they apply. Most of the Vienna Convention is binding as customary law even upon nations that have not ratified it, and many of the treaty articles are declaratory of existing international law; the remaining articles are persuasive as evidence of existing international law.[17]

---

**10.** *Id.*

A sampling of the immunities extended to envoys by the Greeks and Romans indicates that many of the fundamental principles of diplomatic law as they exist today were practiced by them. In ancient Greece and Rome an ambassador was not subject to local jurisdiction when he committed an offense within the territory of the receiving State. The privilege of personal inviolability extended to attaches. It included the ambassador's correspondence and those things essential to the necessary performance of his duties. The immunity of ambassadors from territorial jurisdiction in both criminal and civil matters was fully recognized in Rome. A suit for breach of contract could not be brought against an ambassador before the surrender of his letters of credence. The diplomatic envoy was exempt from the jurisdiction of all courts except those of his own country. Stuart, American Diplomatic and Consular Practice at 6 (1936).

**11.** *See, e.g.,* Stuart, American Diplomatic and Consular Practice at 8 (1936).

**12.** Young, The Development of the Law of Diplomatic Relations, 40 Brit. Yearbook International Law 147 (1964).

**13.** *Id.* at 157.

**14.** *Id.*

**15.** The Vienna Convention is widely acknowledged as the authoritative statement of immunity applicable to relations among nations. It entered into force with respect to the United States on December 13, 1972.

**16.** Young, *supra* at 180–81.

**17.** Garretson, The Immunities of Representatives of Foreign States, 41 N.Y.U.L.Rev. 67 (1966). *See generally* Kerley, Some Aspects of the Vienna Conference on Diplomatic Intercourse and Immunities, 56 Am.J.Int'l Law 88 (1962).

It should be noted that the terms of the Vienna Convention and 22 U.S.C. § 252 are not com-

■ An examination of the pertinent articles of the Vienna Convention,[18] which I find to be declaratory of the customary international law, reveals no basis for cloaking the defendants with the protective blanket of diplomatic immunity. The problem, in its essence, is one of definition: are the defendants by any standard, either codified or customary, within the class of persons traditionally entitled to the benefits of immunity from prosecution? The only answer of which the question admits is that they are not. The full privileges and immunities of diplomatic status have traditionally been reserved to those of acknowledged diplomatic rank, performing diplomatic functions. It is apparent to me, on the basis of what the defendants have placed before me, that their jobs are not of such a nature as to constitute them diplomatic agents by any definition of the term. They are employees of an international organization performing functions internal to that organization. Neither is simple employment by the United Nations necessarily indicative of diplomatic status. *United States v. Coplon*, 88 F.Supp. 915, 920 (S.D.N.Y.1950) [*Coplon II*]; *United States v. Coplon, supra* at 474 [*Coplon I*]. While the United Nations itself, and its top officials, undeniably perform certain diplomatic functions, the defendants' personal connections with those functions are too attenuated to be called diplomatic. A decision to the contrary would have the effect of cloaking virtually every United Nations employee above the clerical level with full immunity. That this has never been intended by the international community is manifest from the more limited immunities provided such employees by treaty and by statute.

■ It is not significant that the defendants possess "a diplomatic rank of Second Secretary conferred on [them] in accordance with the provisions based on the decree of the Presidium of the U.S.S.R. Supreme Soviet on May 28, 1943." Such unilateral action by the U.S.S.R., whatever its import within the Soviet Union, is of no extraterritorial effect, at least in the context of these proceedings. *United States v. Egorov, supra* at 107; *United States v. Melekh, supra* at 76–77. The traditional policy of the United States is that diplomatic immunity will not be conferred upon an individual unless he has both diplomatic status and an " 'intimate association with the work of a permanent diplomatic mission.' " *Coplon II, supra* at 920. The defendants have not claimed that they have been received by the United States or by the United Nations as representatives of the Soviet government. Indeed, any such claim would be baseless, as the exhibits submitted here by the government make clear.[19]

pletely compatible, though their differences are not here material since both provide for full immunity from criminal prosecution. The difference between the two resides in the treatment of civil cases, with the Vienna Convention affording a somewhat more limited immunity than the statute.

In recent years numerous attempts have been made in Congress to repeal the 1790 statute in favor of a law more closely aligned with the provisions of the Vienna Convention. *See, e. g.,* S.Rep. 95–958, June 26, 1978 (recommending enactment of H.R. 7819, which would, *inter alia,* "codify the privileges and immunities provision of the Vienna Convention as the sole United States law on the subject," and repeal the existing codification). In fact, the long delay between the signature of the Vienna Convention and its ratification by the United States was due to the State Department's persistent efforts to have enacted compatible legislation prior to its ratification. Digest of U.S. Practice in International Law at 1964 (1974).

While there is no need to reach the issue in light of the position taken by the defendants, I note that the Vienna Convention does not appear to supersede the 1790 statute under the doctrine of implied repeal. *See Whitney v. Robertson,* 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386 (1888); *The Cherokee Tobacco,* 78 U.S. (11 Wall.) 616, 20 L.Ed. 227 (1871).

18. The articles bearing directly upon the various privileges and immunities accorded representatives of foreign governments are numbers 22–24, 27–35, and 37–41.

19. The courts are bound by a determination of the Department of State that an alien claiming diplomatic status is entitled to that status, since this is construed as a nonreviewable political decision. *In re Baiz,* 135 U.S. 403, 10 S.Ct. 854, 34 L.Ed. 222 (1890); *Sullivan v. State of Sao Paulo,* 122 F.2d 355, 357–58 (2d Cir. 1941); *United States v. Coplon,* 84 F.Supp. 472, 475 (S.D.N.Y.1949). The case for allowing judicial review is stronger where the Executive

More significant on the issue of diplomatic immunity than what the defendants have submitted to support their claim of immunity is what they have failed to submit. They do not claim they ever worked in a capacity other than one within the United Nations Organization; that they have ever been official representatives of the U.S.S.R., and received as such, by the United States; or that either has ever been attached to the Soviet Embassy to the United States or the Soviet mission to the United Nations.

The cases cited by the defendants for the proposition that immunity is often unrelated to accreditation to the United States are inapposite. Those cases deal with the separate problem of guaranteeing the inviolability of representatives travelling through nations to which the representative is not accredited while enroute to the receiving nation. The instant case presents an entirely different set of circumstances and policy considerations.

For the foregoing reasons the motion to dismiss the indictment on the basis of diplomatic immunity is denied.

## II.

The defendants next contend that the indictment should be dismissed for the reason that it does not allege an essential element of the offenses charged. Thus they argue that, while not expressly included in the statutory definition, an essential element of the offense under 18 U.S.C. §§ 793 and 794 is that the information obtained by the person charged be of a secret, non-public nature, a proposition for which they cite as authority *Gorin v. U. S.,* 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488 (1941) and *United States v. Heine,* 151 F.2d 813 (2d Cir. 1945), *cert. denied,* 328 U.S. 833, 66 S.Ct. 975, 90 L.Ed. 1608 (1946).

Contending that, since Counts 1 and 3 assert only that defendants conspired to obtain "national defense" documents, and Count 2 merely asserts that the defendants obtained documents marked "confidential", and that the quoted words are nowhere defined as synonymous with "secret, non-public information," defendants would have me dismiss the indictment for insufficiency.

██ Clearly, an indictment must allege all the elements of the offense charged, and, where all are included within the statutory language, it is appropriate procedure to track the statutory language in charging the offense.

I turn to the indictment itself.

██ Count 1 charges that the defendants conspired "to obtain information respecting the national defense of the United States, that is, photographs, photographic negatives, documents, and other writings connected with the national defense of the United States." Count 2 charges that the defendants "for the purpose of obtaining information respecting the national defense of the United States, did knowingly and wilfully obtain photographic film of a document and writing connected with the national defense of the United States entitled 'Naval Air Development Center, Johnsville, Warminster, Pennsylvania, Report No. NADC–SD–7167, 15 October 1971, Light Airborne Multipurpose System (LAMPS) D/V–98 Phase B (AntiSubmarine Warfare) Final Report,' marked 'Confidential.'" Count 3 charges that the defendants conspired to communicate, deliver, and transmit "photographs, photographic negatives, documents, and other writings and information relating to the national defense of the United States."

I find that the requisite elements are embraced by the charges of the indictment.

finds an individual not to have been a diplomat, Note, 49 Mich.L.Rev. 101, 108 (1950), but even so the courts have generally acceded to the determination of the Executive. *See United States v. Coplon,* 88 F.Supp. 915, 921 (S.D.N.Y. 1950) (United Nations employee claiming diplomatic status):

There is no reason in principle why the determination of the Secretary of State in

this case should not be afforded equal weight with a similar determination of the diplomatic status in the case of public ministers or ambassadors sent to represent foreign governments in this country. The latter certifications have universally been held to be conclusive upon the courts. And I feel that the certification in this case is equally conclusive. (citation omitted)

Defendants misread *Gorin* and *Heine.*

In *Gorin* the only issue presented was in the defendants' argument that the Espionage Act was limited to obtaining and delivering information concerning the places and things now described in 18 U.S.C. § 793(a). Otherwise, they contended, a statutory prohibition against "furnishing of any other information connected with or relating to the national defense than that concerning these specifically described places and things would make the act unconstitutional as violative of due process because of indefiniteness." 312 U.S. at 23, 61 S.Ct. at 432. The Court rejected this analysis.

The Court held the statute not to be limited to the places and things now described in 18 U.S.C. § 793(a), and found the statutory language not to be so indefinite as to be unconstitutional, stating:

But we find no uncertainty in this statute which deprives a person of the ability to predetermine whether a contemplated action is criminal under the provisions of this law. The obvious delimiting words in the statute are those requiring "intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation." This requires those prosecuted to have acted in bad faith. *The sanctions apply only when scienter is established. Where there is no occasion for secrecy, as with reports relating to national defense, published by authority of Congress or the military departments, there can, of course, in all likelihood be no reasonable intent to give an advantage to a foreign government.* Finally, we are of the view that the use of the words "national defense" has given them, as here employed, a well understood connotation. They were used in the Defense Secrets Act of 1911. The traditional concept of war as a struggle between nations is not changed by the intensity of support given to the armed forces by civilians or the extension of the combat area. National defense, the Government maintains, "is a generic con-

cept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." We agree that the words "national defense" in the Espionage Act carry that meaning. Whether a document or report is covered by §§ 1(b) or 2(a) depends upon its relation to the national defense, as so defined, not upon its connection with places specified in § 1(a). The language employed appears sufficiently definite to apprise the public of prohibited activities and is consonant with due process. (emphasis supplied) (footnotes omitted)

312 U.S. at 27–28, 61 S.Ct. at 433–434.

■ The meaning of *Gorin*, for our purposes, is clear. Scienter, that is, intent or reason to believe that the information to be obtained is to be used to the injury of the United States, or to the advantage of any foreign nation, is an essential element under §§ 793 and 794. It is properly alleged. It must also be proved. In the course of the proofs, evidence bearing upon the issue of secrecy will be relevant, for, as the Court said in *Gorin*, "[w]here there is no occasion for secrecy, . . . there can, of course, in all likelihood be no reasonable intent to give an advantage to a foreign government." 312 U.S. at 28, 61 S.Ct. at 434.

As to *Heine*, it simply dealt with explaining an element of the offense already contained in the statute. It did not add an additional element.

■ The three counts of the indictment are therefore not defective for relying upon the statutory language to allege the elements of the offense. *See* Fed.R.Cr.P. 7(c). There was no need to allege that the information sought and obtained was of a secret, non-public nature. The defendants' motion to dismiss the indictment for failure to allege an essential element is denied.

### III.

Defendants next urge dismissal of the indictment on the grounds it is vague and ambiguous. At the heart of any determination on the contentions thus posed is *United*

*States v. Cruikshank,* 92 U.S. 542, 558, 23 L.Ed. 588 (1876), where the United States Supreme Court said:

> The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable to make his defence, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had.

The vagueness and ambiguousness is said to lie in the fact that in 20 of the 59 overt acts alleged in Counts 1 and 3 the defendants claim to be unable "from any fair reading" to determine "whether the alleged conspirator made the calls at the telephone booth described in the overt acts or whether they were made from another telephone booth to the Navy officer stationed at the telephone booth described in the overt acts."[20]

 This motion is without merit. The indictment need only allege one overt act done to effectuate the conspiracy. Here, as defendants concede, 39 alleged overt acts are free from vagueness and ambiguousness.

Moreover, even a cursory reading of all the overt acts makes it plain that the Navy officer referred to had been directed to go to a public telephone and that overt act 1 clearly means that the Navy officer was "at a public telephone" when telephoned by a conspirator on August 30, 1977.

### IV.

 Defendants' motion to strike as surplusage paragraphs 5 and 6 of Count 1 is denied. These paragraphs read as follows:

> 5. At all times relevant herein the passenger vessel MS *Kazakhstan* was owned and operated by the Union of Soviet Socialist Republics through the Black Sea Shipping Company, Odessa, U.S.S.R.

> 6. On August 13, 1977, said Navy officer boarded the MS *Kazakhstan* for a round-trip voyage from New York, New York, to Bermuda, returning to New York on August 20, 1977.

The defendants argue that these allegations have no connection to the offense charged in the indictment, are inflammatory and prejudicial, and should be stricken.

Rule 7(d) of the Federal Rules of Criminal Procedure provides: "The court on motion of the defendant may strike surplusage from the indictment or information."

The United States, in its brief, states the following:

> These allegations are that the MS *Kazakhstan* was owned and operated by the Soviet Union and that the Navy officer was aboard the vessel from August 13 to 20, 1977. The Government represents that the evidence at trial will show that the telephone call listed in Overt Act No. 1 was a direct result of events that occurred aboard the MS *Kazakhstan* between August 13 and 20, 1977. The allegations are therefore relevant to show the background of the first telephone call and the relationship that thereafter developed through the use of telephones and short-term caches.

> Furthermore, one of the material facts the Government will seek to establish at trial is that the defendants and other co-conspirators acted on behalf of the Soviet Union. One of the many factors establishing this relationship will be events that transpired on the Soviet vessel. In this regard, the fact that the defendants Enger and Chernyayev and the co-conspirator were not on board the vessel at the time is probative of the common connection between the vessel, the Soviet government, and these conspirators. It should be noted that the indictment dates the conspiracy from "at least August 20, 1977," the date the MS *Kazakhstan* arrived back in New York.

---

**20.** The defendants' argument, dealing as it does with overt acts alleged in connection with a charged conspiracy, does not affect the substantive offense alleged in Count 2 of the indictment.

From the above, it is apparent that testimony concerning the MS *Kazakhstan* will be given at trial and is probative of issues that will be considered by the jury. Brief in Support of Government's Answers to Defendants' Pretrial Motions, 31–32.

Given the representations made by the United States, it is clear that there will be at trial reference to the MS *Kazakhstan* and the Navy officer's voyage on it in August 1977. Moreover, I fail to perceive the alleged inflammatory prejudice inherent in the allegation that the vessel was owned by the U.S.S.R. This is particularly true since the United States represents it will show a connection between the defendants and the U.S.S.R.

## V.

### *Defendants' Request For Particulars*

In *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir. 1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972), the Court of Appeals for the Third Circuit described the purpose of a bill of particulars:

"The purpose of the bill of particulars is to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense." . . . A bill of particulars should fulfill this function "when the indictment itself is too vague and indefinite for such purposes."

(citations omitted)

The court in *Addonizio* also stated that a bill of particulars is not to be used as a source of wholesale discovery of the evidence in possession of the United States or to require the prosecution to assemble the information in its files into a fully integrated trial theory. *Id.* at 64.

Review of the indictment reveals that it informs the defendants of the nature of the charges, provides adequate notice to prepare their defense and describes their criminal venture sufficiently so as to protect them against subsequent prosecution. Ad-

ditionally, the affidavits underlying the arrest and search warrants convey a substantial amount of information.

Finally, government compliance with my discovery order, copying of trial exhibits and voluntary disclosure thereof and other materials, assure that these defendants will not be surprised at trial. Given the disclosures described, the defendants will be enabled to prepare thoroughly for trial.

The defendants' demands for particulars must be construed in the light of the foregoing.

I shall now deal with the defendants' demands item by item:

1–6. The United States will disclose the name, rank and nature of the commission and the type of security clearance of the Navy officer referred to in the indictment. All other requests in items 1–6 are denied.

7. Denied.

8. Answer to the extent of the knowledge of the United States at this time.

9. Denied.

10. The United States shall furnish the names of any co-conspirators not named in the indictment not later than 10 days before trial. Otherwise, 10 is denied.

11. Denied.

12. Denied.

13. Denied.

14. Denied.

15. Denied.

16. Denied.

17. Denied.

18. Denied.

19. Denied.

20. Denied.

21. Denied.

22. Denied.

23. Denied.

24. Denied.

25. Denied.

26. Denied.

27. Denied.

28. Denied.

29. Denied.

30. Denied.

31. Denied.

32. Denied.

33. Denied.

34. Denied, except the United States shall furnish the names of presently unidentified co-conspirators not later than August 31, 1978.

35. Answer.

36. Answer.

37. Denied.

38. Answer.

39. Answer.

40. Denied.

To the extent the United States wishes to apply for a protective order with respect to any of the foregoing, prompt application therefor should be made. Moreover, the United States, notwithstanding the foregoing, is to respond to the direction given by me at argument relative to its theory of who retrieved the Tropicana container on May 20, 1978.

### VI.

Defendants also move for discovery and inspection.

Except as to the document which is the subject of Count 2 of the indictment, which is to be disclosed, their request as put is denied for the reason set forth in the United States' Brief: that I have ordered and the defendants have or will receive extensive access to evidential materials in the possession of the United States.

**21.** The Court recognized in *Wong Sun* that the fourth amendment exclusionary rule applies to statements obtained following an illegal arrest just as it does to tangible evidence seized in a similar manner or obtained pursuant to an otherwise illegal search and seizure.

*Wong Sun* acquired significant gloss this term in *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

### VII.

The defendants have also filed a Request for Disclosure.

1. Answer.

2. Answer.

3. Answer.

4. Answer.

5. Answer.

6–8. Answer in terms of the approximate vicinity where cameras were located, when and where photographs, videotapes and recordings were taken or made; the balance is denied.

9. All *Brady* material is to be disclosed. Any material about which the United States is doubtful should be turned over to this court for *in camera* review.

10. Denied.

11. Denied, except that, to the extent *Brady* material is involved, proceed as in 9, *supra.*

12. Answer.

13. Answer.

### VIII.

Defendants next urge that all evidence taken from their persons incident to their arrests pursuant to warrants issued on May 12, 1978 should be suppressed, because the warrants were defective and the underlying complaints did not establish probable cause. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[21] The United States contends that the search was valid as incident to a lawful arrest. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

Fourth amendment values were vindicated most recently in this circuit in *Gillard v. Schmidt,* 579 F.2d 825 (3d Cir. 1978). See also *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *cf. United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

*The Law*

Rule 4 of the Federal Rules of Criminal Procedure provides in pertinent part as follows:

Rule 4. Arrest Warrant or Summons upon Complaint

(a) Issuance. If it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is probable cause to believe that an offense has been committed and that the defendant has committed it, a warrant for the arrest of the defendant shall issue to any officer authorized by law to execute it. Upon the request of the attorney for the government a summons instead of a warrant shall issue. More than one warrant or summons may issue on the same complaint. If a defendant fails to appear in response to the summons, a warrant shall issue.

(b) Probable Cause. The finding of probable cause may be based upon hearsay evidence in whole or in part.

(c) Form.

(1) Warrant. The warrant shall be signed by the magistrate and shall contain the name of the defendant or, if his name is unknown, any name or description by which he can be identified with reasonable certainty. It shall describe the offense charged in the complaint. It shall command that the defendant be arrested and brought before the nearest available magistrate.

\* \* \* \* \* \*

■ The fourth amendment to the United States Constitution guarantees that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the person or things to be seized. . . ." Probable cause exists where the facts and circumstances within the officer's knowledge, and of which he had reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in believing that an offense has been or is being committed. *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *and see Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964).

In *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), the United States Supreme Court noted that the language of the fourth amendment which applies to arrest as well as to search warrants,[22] construed with Rule 4 of the Federal Rules of Criminal Procedure, affords the protection:

" . . . that the inferences from the facts which lead to the complaint ' . . . be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime'. *Johnson v. United States,* 333 U.S. 10, 14 [, 68 S.Ct. 367, 92 L.Ed. 436] [1948]. The purpose of the complaint, then is to enable the appropriate magistrate . . . to determine whether the 'probable cause' required to support a warrant exists. The [magistrate] must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime."

22. "It is generally assumed that the same quantum of evidence is required whether one is concerned with probable cause to arrest or probable cause to search." Kamisar, LaFave and Israel, Modern Criminal Procedure (Fourth ed. 1974), 228 (*Kamisar*). Thus, the United States Supreme Court in *Spinelli v. United States,* 393 U.S. 410, 417, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), dealing with the adequacy of a search warrant, drew upon *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), involving an arrest warrant, for a probable cause standard. As *Kamisar* notes, however, different conclusions must be drawn, in the case of arrest, those relating to the arrestee's guilt, in the case of search warrants, those relating to the connection of the items sought with crime and to their present location. *Kamisar,* at 229.

357 U.S. at 486, 78 S.Ct. at 1250. *Cf. Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

 Moreover, while a complaint may be based upon hearsay, Fed.R.Cr.P. 4(b), in such case the court must be informed of the underlying circumstances from which the officer concluded that the informant was credible and his information reliable. *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

 In reviewing the question of whether there was probable cause for the issuance of the search or arrest warrant, the court must determine whether there was "substantial basis" for the decision of the magistrate that probable cause existed. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1966).[23] In this regard, it is also noted that, given the preference expressed by the Supreme Court for arrest warrants as well as search warrants, *see Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) and *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), the Court has noted that "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fail." *Id.* at 106, 85 S.Ct. at 744.[24]

Additionally, the Supreme Court has directed that "the magistrate is obligated to render a judgment based upon a common-sense reading of the entire affidavit," *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and has admonished that ". . . [a] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a

judicial officer before acting." *United States v. Ventresca, supra* 380 U.S. at 108, 85 S.Ct. at 746.

The remaining legal principle urged upon the court by the United States is expressed in *United States v. Miles,* 468 F.2d 482, 486–87 (3d Cir. 1972):

> Unlike a search warrant, an arrest warrant is not a constitutional prerequisite to an arrest. Moreover, even if an arrest warrant has been issued and it is invalid, the arrest may be lawful if the arresting officer had probable cause to believe that the suspect was committing or had committed a felony.

*Cf. Aguilar v. Texas, supra,* 378 U.S. at 116, 84 S.Ct. 1509 (dissenting opinion by Clark, J.); *but see Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

All of the foregoing principles are explicated as the law of this circuit in *United States v. McNally,* 473 F.2d 934, 937 (3d Cir. 1973).

*The Facts Before the Magistrate*

 I now turn to an examination of the complaint to discover if the facts set forth therein, and the reasonable inferences fairly to be drawn from those facts, support the magistrate's determination that probable cause existed for issuance on May 12, 1978 of the warrants of arrest under Fed.R. Cr.P. 4 and the fourth amendment.[25]

Defendants' sifting of the complaint's averments suffers from their rejection of the "common sense" interpretation mandated by the Supreme Court, and their pursuit of an evaluative technique which frees

---

**23.** *See* Defendants' Memorandum of Law in Support of Motions, p. 40.

**24.** *See also United States v. Londono,* 553 F.2d 805, 810 (2d Cir. 1977):

> A determination of probable cause made by a magistrate on the basis of a detailed affidavit is entitled to deference by a reviewing court. *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *United States v. Canestri,* 518 F.2d 269, 273

(2d Cir. 1975); *United States v. Ramirez,* 279 F.2d 712, 716 (2d Cir.), *cert. denied,* 364 U.S. 850, 81 S.Ct. 95, 5 L.Ed.2d 74 (1960). . .

**25.** I put aside for the moment consideration of the *Miles* doctrine, and what additional "probable cause" facts the arresting agents had on May 20, 1978, when defendants were arrested. *See* 518, *infra.*

them to dissect and examine in isolation each factual averment not only divorced from what preceded and followed it in time, but torn from a logically consistent array of circumstances forming a coherent whole. Their arguments are also defective in failing to consider inferences which the magistrate could have reasonably drawn from the bald averments of the affiant, and to which I shall shortly refer. Thus, the raw facts of the numerous contacts, the delivery of documents and cash, the use of an alias, the arcane and ingenious means of communicating with the confidential source adopted by the defendants, as alleged in the complaint, are only a part of the total canvas unveiled to the magistrate by the affiant.

I shall now review the complaint to determine whether, in the light of logical analysis, the magistrate might reasonably have concluded that there was probable cause to believe that the crimes there designated were committed by the defendants. My determination need not and does not go beyond this.

### a. *The confidential source*

The agents were early in touch with, and acquired much of their information from, a "confidential source," whose reliability on seven previous occasions had been "proven to be true and accurate." This source had "a secret security clearance . . . [and] access to classified information." The magistrate could have reasonably found he had a connection with, or knowledge of, United States naval affairs, as evidenced by the fact of verification rendered previous information he had given by the "U.S. Naval Investigative Service," and by the nature of the national defense information he had

been allegedly paid several thousand dollars by the defendants to procure, including "secret information concerning anti-submarine warfare; including materials involving underwater acoustics, submarine detection systems and their platforms, such as the 'LAMPS' helicopter systems, and other classified United States Navy programs."

Not only the reliability of the confidential source, but the means by which he acquired the information embodied in the complaint, were validated, as required by *Spinelli* and *Aguilar,* by the contents of the confidential source's statements to the affiant agent. *See United States v. Harris,* 403 U.S. 573, 579, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Moreover, the magistrate could reasonably have found that the investigating agents, including the affiant, having been alerted by the confidential source as early as August 30, 1977 to possible espionage, were able to confirm or verify virtually every revelation made by the confidential source thereafter, particularly with respect to the events of February 18, 1978 and March 11, 1978. Thus, the magistrate could reasonably have concluded the confidential source was reliable and truthful and that he was experiencing first-hand the events he described to the affiant. *United States v. Harris, supra.*

### b. *The alleged conspirators*

Given the ingredients of the complaint, considered in their totality, the magistrate could have reasonably concluded that a foreign power was, or a person or persons who sought to advance the interests of a foreign power were, engaged in an unlawful enterprise as described to the affiant by the confidential source.[26] The interest in the

26. Accepting the allegations of the complaint, the magistrate could reasonably have concluded that there was underway an espionage scheme that was elaborate, well planned and well executed. The alleged wrongdoers were described as making highly particularized requests for documents; the magistrate could have justifiably concluded that the alleged wrongdoers were highly trained in espionage, from the skillful manner in which they ar-ranged repeated contacts, delivery of classified documents, evaluation of said documents, and reimbursement therefor, in what was a paradigmatic and well financed "secret agent" operation. The details of this operation, as they were disclosed to the magistrate by the complaint, will be covered below. The alleged conspirators, according to the complaint, had thought of everything, even "a permanent contact point in Finland."

relative strengths of the navies of the United States and the U.S.S.R., and, more particularly, their respective submarine components, as well as this nation's endeavors in detection of potentially hostile submarines, widely disseminated and discussed in the various media, would have justified the magistrate's conclusion, for purposes of probable cause analysis, that the foreign power the alleged wrongdoers were serving, or seeking to serve, was the U.S.S.R.

Moreover, the complaint identified by name and position the three suspects: Chernyayev, "a Soviet national employed as a Personnel Officer by the United Nations Secretariat, New York, New York," who resided "at 5800 Arlington Avenue, Bronx, New York"; Enger, "a Soviet national employed as a Political Affairs Officer, United Nations Secretariat," who resided "at 136 Mill River Road, Brookville, New York"; and Zinyakin, "Third Secretary, Soviet Mission to the United Nations." Repeatedly, according to the complaint, in sightings made by FBI surveillance, these three were seen at sites critical to a particular contact then being made with the confidential source.[27]

Thus, "the confidential source . . . observed" Chernyayev's automobile "in the vicinity of the areas where . . . [the confidential source] had been directed" to go "by the unknown caller." Surveilling agents actually saw Chernyayev himself [on October 22, 1977, December 3, 1977 and January 7, 1978], "recognized by them from the performance of their normal duties," in the "immediate vicinity of various pertinent locations on or near the Garden State Parkway and the New Jersey Turnpike during the times the confidential source was at those locations in accordance with instructions received from the unknown caller."

The complaint also states that while Chernyayev was seen in his automobile at the "various pertinent locations" on December 3, 1977, FBI agents also saw there on the same date, Enger and Zinyakin, in Enger's car. The magistrate could reasonably have concluded that the use of two automobiles served to suggest the three were working together in the unlawful enterprise described in the complaint.

Moreover, on January 7, 1978, the day Chernyayev had been observed at the "pertinent locations," the confidential source had passed certain materials, according to the complaint; and at the next contact, on February 18, 1978, Chernyayev, Enger and Zinyakin were in the same automobile, Enger's, at two critical locations, the Essex Toll Plaza on the Garden State Parkway, and in the vicinity of Freeway Drive and North Oraton Parkway, East Orange.[28] It was on this date the confidential source received $3,000 for the information he had passed on January 7, 1978.

The complaint next details the events of March 11, 1978. Enger's car was observed with Enger and Zinyakin in it, Enger driving, at a critical site in Perth Amboy (where Zinyakin picked up a container in a telephone booth, which the complaint alleges was deposited by the confidential source).

Shortly thereafter, according to the complaint, Zinyakin transferred to an automobile driven by Chernyayev and he and Chernyayev then drove into the Cheesequake Service Area on the Parkway where Enger, driving his car, joined them. After there engaging in conversation, the three parted. Chernyayev drove off with Zinyakin and Enger followed.

Summarizing the foregoing, the following emerges from the complaint:

*State of New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), upon which defendants rely.

---

**27.** The pattern of activity reflected in the complaint, manifested by repeated visits to New Jersey by the defendants, reinforced by the surreptitious conduct which the magistrate could reasonably have concluded to be that of spies for a foreign power, makes distinguishable *United States v. DiRe*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948) and *Sibron v.*

**28.** Details of the events of February 18 and March 11, 1978 are hereinafter covered. *See* 517, *infra*.

Sightings at "drops" or contact points

| October 22, 1977 | Chernyayev | |
| December 3, 1977 | Chernyayev | Enger with Zinyakin |
| January 7, 1978 | Chernyayev | |
| February 18, 1978 | Chernyayev and Zinyakin with Enger in latter's car. | |
| March 11, 1978 | Chernyayev (joined by Zinyakin after he picked up package left by confidential source). | Enger (originally with Zinyakin who left and went with Chernyayev). |

The magistrate thus could have reasonably concluded, in terms of probable cause analysis, that Chernyayev, Enger and Zinyakin were engaged in a joint enterprise, with Chernyayev on occasion furnishing a "back-up" for Enger and Zinyakin; on other occasions, with Enger and Zinyakin furnishing a "back-up" for Chernyayev; and, on one occasion, the three together in one automobile.

Given the appearance of furtiveness, as described in the complaint, with which contacts were made with the confidential source, the magistrate could have properly concluded that the three alleged conspirators had different functions to perform on a particular day. Thus, on January 7, 1977, when only Chernyayev had been observed at a pertinent site, the magistrate might have properly concluded that Chernyayev had picked up the documents left by the confidential source. That they were picked up and evaluated could have been inferred from the payment of $3,000 on the next contact, February 18, 1978, when, it is alleged, Enger this time played an active role, twice leaving his automobile at pertinent sites while Chernyayev and Zinyakin remained in it.

A conclusion by the magistrate that the three were engaged in a joint enterprise could have drawn vitality from their common nationality; the fact that Chernyayev and Enger were both attached to the United Nations in New York City, while Zinyakin was attached to the U.S.S.R. Mission to the United Nations, thus establishing an apparent relationship between them; their repeated trips to New Jersey, usually in separate automobiles, which saw them always in the vicinity of one another, and at a critical location; the close presence of one or two while a third acted so as to suggest he was passing information to the confidential source; and the improbability of espionage, as alleged in the complaint, being engaged in on so many occasions, by two U.S.S.R. nationals without the third, who was invariably present, being involved as well, a proposition the magistrate could have properly found strengthened by the fact that apparently none of the three had any reason for being in New Jersey on so many occasions unless it was to contact the confidential source.

Actually, the defendants' Memoranda contest vigorously the probable cause issue only as to Chernyayev. *See, e. g.,* Defendants' Reply Memorandum of Law in Support of Defendants' Motions, 58–63. *Arguendo,* even if proof of the facts in the complaint, and the reasonable inferences to be drawn therefrom, would not demonstrate Chernyayev's guilt beyond a reasonable doubt to a jury, that is not here the test. *Cf. United States v. Londono,* 553 F.2d 805, 810 (2d Cir. 1977). It is, as has been stated, whether the totality of the complaint adds up to probable cause.

I now turn to the details of the transactions to determine whether the magistrate properly found probable cause to believe that defendants were committing the

crimes charged while engaged in joint enterprise.

### c. *The transactions*

The magistrate could have reasonably concluded from the complaint that from August 20, 1977, and during the repeated contacts thereafter, including those on September 7 and 24, October 22, December 3, 1977, January 7, February 18, and through March 11, 1978, the confidential source was involved in a continuing enterprise which saw him, albeit while cooperating with the FBI, delivering, always in accordance with the same instructions, national defense documents to "Jim" and others, and receiving thousands of dollars therefor.

Given the unchallenged averments in the complaint, it is plain that there is substantial support for the magistrate's finding of probable cause that the defendants had committed the crimes alleged in the complaint.

I have heretofore dealt with observations made of the defendants prior to February 11, 1978. As to events of the latter date, their details are important in evaluating the magistrate's ultimate determination.

At 2 p. m. on February 18 the confidential source received a telephone call at the Brookdale Service Area on the Garden State Parkway. He was directed to a specified telephone booth immediately south of the Essex Toll Plaza on the Parkway, where a package for him was located under the shelf. Following this direction, he retrieved a container within which were written instructions from "Jim" and a map. These instructions in turn led him to an area in East Orange, New Jersey, where he deposited cans containing films of documents and picked up a can containing a letter and $3,000 in currency for the materials he had passed on January 7, 1978. This letter, among other things, arranged the next meeting on March 11, 1978. The confidential source then drove to still another location on the Parkway where he received another telephone call from "Jim," acknowledging receipt of the materials just deposited in East Orange and confirming the March 11 meeting.

While at 2 p. m. on February 18, 1978 the confidential source was getting a call directing him to the Essex Toll Plaza location, Enger was seen to get out of his car (occupied also by Chernyayev and Zinyakin) at that location and make a telephone call, of two minutes' duration, during which he was observed placing his hand under the shelf in the booth. The magistrate could have concluded, in view of the surveilling agents having inspected the underside of the shelf after Enger left the area, and having discovered a magnetic container in which was secreted a letter to the confidential source from "Jim," that it had been placed there by Enger.

Thereafter, while the confidential source was placing his film and getting the $3,000 at the East Orange location, agents saw Enger's car, with Enger and Chernyayev in it, in the same area. The magistrate could have properly concluded that Enger and Chernyayev, having picked up the film, were then able to stop at a telephone and call the confidential source at a prearranged place and acknowledge receipt of the materials and confirm the date of the next meeting.

The March 11, 1978 transaction is best told by quoting at length from the complaint (8–10):

On March 11, 1978, the confidential source advised the complainant that on that date at about 2:01 p. m. he was called at a public telephone at the Cheesequake Service Area, Garden State Parkway, by an unknown male caller identifying himself as "Jim," who instructed him to retrieve a container secreted under the shelf of a specified public telephone booth in that area, and to read and follow the instructions contained therein. "Jim" told the confidential source he would call him again at the phone identified in the written instructions.

Pursuant to instructions the confidential source retrieved this container which contained a typewritten letter from "Jim" which instructed the confidential

source that "To-day we'll have the same kind of the operation we had last time" and directed him to proceed to the drop site at "the third lighting pole." The confidential source followed these instructions and retrieved a red "Martinson" coffee can from the base of the third pole on Fulner Street in South Amboy, New Jersey and deposited his camouflaged milk carton containing exposed film of documents at that same location at about 2:25 p. m.

The confidential source advised that in this coffee can were secreted $3,000 in U.S. currency and a typewritten letter from "Jim," which stated in part as follows:

> "We have roughly evaluated the latest materials received from you. Enclosed, please, find $3000 for them. By the way, have you paid attention to my request to pass over to us the films of latest documents dated 1976–1978, if possible?"
>
> "Our next operation will take place on May 13."
>
> "For that operation, please try to prepare materials on submarine acoustic detection systems."

The complainant personally observed and was advised by other Special Agents of the Federal Bureau of Investigation who participated in this investigation that on March 11, 1978 a gray Dodge bearing New York license 155–QXR was observed driving around in the vicinity of the third pole on Fulner Street in South Amboy, New Jersey, immediately prior to the time when the confidential source deposited his container of documents at the base of this third pole. Also defendant ENGER was the driver and co-conspirator ZINYAKIN was a front seat passenger in this Dodge. Shortly after the confidential source had deposited his container of documents, Special Agents of the Federal Bureau of Investigation who participated in this investigation advised the complainant that they observed the following at about 2:26 p. m.:

The above gray Dodge with defendant ENGER driving and co-conspirator ZIN-YAKIN a front seat passenger approached and stopped near the above third pole where co-conspirator ZINYA-KIN walked quickly to the above third pole where he picked up the milk carton of filmed documents and immediately entered the rear seat behind defendant ENGER who then drove north on Fulner Street.

The confidential source advised the complainant he received a subsequent telephone call that day at another public telephone booth from "Jim," who acknowledged that he had received the documents and May 13 was confirmed as the date for the next operation.

The complainant was further advised by other Special Agents of the Federal Bureau of Investigation who participated in this investigation that on March 11, 1978 they observed the following:

At about 2:31 p. m., defendant ENGER, alone in the gray Dodge, was observed driving around a traffic circle near exit 125 of the Garden State Parkway; at about 2:37 p. m., defendant ENGER alone was observed in this gray Dodge at the Cheesequake Service Area; at about the same time, a light blue Dodge bearing New York license 480–GPF, drove into the Cheesequake Service Area driven by defendant CHERNYAYEV and occupied in the front passenger seat by co-conspirator ZINYAKIN. Shortly thereafter, defendants ENGER and CHERNYAYEV and co-conspirator ZINYAKIN were observed at that same location carrying on a very animated conversation. Defendant CHERNYAYEV and co-conspirator ZINYAKIN then left together in the above blue Dodge and defendant ENGER followed immediately in his gray Dodge with both vehicles travelling northbound on the Garden State Parkway.

By virtue of the foregoing, I conclude that the warrants authorizing the arrests of the defendants were properly issued on a sufficient showing of probable cause.

In view of this holding, there is no reason to consider the government's *Miles* argument. *See* 513, *supra*.

The arrest warrants were, I find, validly executed.

■ The defendants claim that the arrest warrants were tardily executed and that "all evidence taken pursuant thereto must be suppressed." Defendants' Memorandum at 45. While it is true that the arrest warrants in this case were executed eight days after they were issued, that fact has no legal significance. In *United States v. Joines,* 246 F.2d 278 (3d Cir. 1957), the court affirmed the defendant's conviction on the basis that a search conducted pursuant to a bona fide attempt to arrest him was legitimately conducted. The Supreme Court vacated the conviction and remanded for reconsideration in light of *Jones v. United States,* 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). *Joines v. United States,* 357 U.S. 573, 78 S.Ct. 1380, 2 L.Ed.2d 1546 (1958). On remand the court of appeals again affirmed, noting:

> [O]rdinarily there is no legal requirement that a warrant of arrest must be executed immediately or at the first opportunity. . . . While its execution should not be unreasonably delayed there may be perfectly valid reasons why further investigation should be made before the drastic step is taken of arresting a citizen on a criminal charge. Certainly there is no constitutional right to be arrested promptly or otherwise.

*United States v. Joines,* 258 F.2d 471, 472–73 (3d Cir.), *cert. denied,* 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958).

I find no element here which suggests the United States acted improperly in not executing the warrants for eight days.

As to disclosure of the name of the confidential source, if he is the Naval officer referred to in the indictment, his name should be disclosed.

## IX.

Defendants next move to suppress the evidence seized from their automobiles, alleging that the seizure was pursuant to invalid search warrants.

*Probable Cause*

■ The magistrate properly concluded that there was probable cause to search the defendants' automobiles for the items listed in the search warrants. *See* Fed.R.Cr.P. 41(b). *See also Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); and *see United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).[29]

■ Given the magistrate's determination, which must be paid great deference, *United States v. McNally,* 473 F.2d 934, 937 (3d Cir. 1973), and applying the doctrine of *Ventresca, supra,* that a "grudging or negative attitude by reviewing courts toward warrants" is to be eschewed, 380 U.S. at 108, 85 S.Ct. at 746, it is clear that there was ample probable cause demonstrated to the magistrate for the warrants to issue. Thus, the search warrant affidavits reiterated all of the essential facts of the complaint, including those demonstrating that the defendants had used their automobiles extensively in their alleged espionage activities. *See, e.g.,* Affidavits at 11.

As the United States points out, many of the items listed in the warrants were contained there or formed part of one or more of the packages allegedly hidden by the defendants, to be picked up by the confidential source referred to in the affidavits. There was also probable cause to search for and to seize other items on the list based upon the nature of the alleged illegal activities described in the affidavits, such as "electronic signalling devices," and "binoculars" as well as electronic devices to intercept or monitor F.B.I. communications. There was also probable cause to search for and seize "lists of names and/or telephone numbers," in view of the revelation of the alleged espionage activities disclosed in the affidavits and because the confidential source was repeatedly called at public telephone booths.

---

**29.** Point VIII, *supra,* discusses at length the law of "probable cause."

I find without merit the defendants' claims that the warrants were based upon stale information and that the affidavits underlying the warrants contained a misstatement which requires that the evidence seized be suppressed.

██ What cannot be overlooked here is the fact that, given the averments of the affidavits underlying the warrants, the magistrate was presented with a chain of connected events, with each link, a particular contact, tied to the contact before and after it. Thus, the magistrate was advised that the confidential source would be given instructions on one occasion on how contact would be established with him on the next occasion; and that, at one contact, the confidential source would be told what information was sought and was to be delivered on the next occasion. Additionally, the confidential source, according to the affidavits, after delivery of information sought by the alleged conspirators, was told at a subsequent contact that they had evaluated this information and received cash in payment for the previously delivered information. Since, over the period of many months, the technique for arranging contacts, depositing instructions, retrieving material, and paying for the information, never varied, and saw the named conspirators involved throughout, it cannot be said that the information which was placed before the magistrate was "stale" on May 20, 1978 simply because it related to an observation made several weeks before.

With respect to the claim that the warrants contained a misstatement, as I indicated at oral argument, I find the argument to be without merit. Nonetheless, given the apparent good faith with which it was raised, I have directed the United States to set forth its theory as to what person or persons "retrieved" the Tropicana container on May 20, 1978.

*The Generality of the Warrant*

The defendants argue that the search warrants are invalid because the items to be seized are not described with sufficient particularity, making the warrants, which are identical in their descriptions of the items to be seized, overbroad and general in nature. The defendants point specifically to the warrants' authorizations to seize "espionage paraphernalia, which are evidence, instrumentalities, and fruits of the crimes of conspiracy in violation of Title 18, United States Code, Sections 793(g) and 794(c)." This language, defendants contend, vested in the FBI agents who executed the warrants an unbounded discretion to decide what constituted evidence of the alleged conspiracy.

The fourth amendment provides that no warrant shall issue unless it "particularly describ[es] the place to be searched, and the persons or things to be seized." As the Supreme Court noted in *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927):

> The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.

The description need not be technically precise, but must be sufficiently particular so that the warrant is not "a mere roving commission." *United States v. Quantity of Extracts, Bottles, Etc.*, 54 F.2d 643, 644 (S.D.Fla.1931). *Accord, Andresen v. Maryland*, 427 U.S. 463, 478–82, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *United States v. Klein*, 565 F.2d 183 (1st Cir. 1977); *United States v. Drebin*, 557 F.2d 1316, 1322 (9th Cir. 1977).

I find that the warrants issued for the automobiles and their contents constituted general warrants proscribed by the fourth amendment; accordingly, the fruits of the searches must be suppressed.

Nowhere in either the warrants or in affidavit form is there a definition of "espionage paraphernalia." The fact that the term may be read in the context of the listing of specific items to be searched for which precedes it, *Andresen v. Maryland*,

*supra,* sheds no light on the subject. Indeed, the nature of the items seized by the FBI agents, including blank paper, pencils, and a Carter-Mondale campaign button, provides a strong indication that the agents either did not understand the term "espionage paraphernalia" or perceived no limit in the warrants on the scope of the searches.[30] *See In re Search Warrant Dated July 4, 1977,* 436 F.Supp. 689 (D.D.C.1977). Thus, the facts undercut the government's argument that the "justifications for the remaining items listed in the warrants—e.g., 'espionage operating instructions', [sic] 'espionage paraphernalia'—are self-explanatory." [Government's Brief at 74]

The need for particularity is especially significant where, as here, the warrant authorized seizure of evidence of the crime of conspiracy.

> It seems self-evident, then, in considering both the warrant and the affidavit supporting it, that the agents in this case had no clear standard to guide their exercise of discretion. . . . For unless the contents of any particular document rendered it manifestly criminal, the decision whether to seize it was complicated by the subjective considerations attending the law of conspiracy. In effect, each agent had been delegated authority to consider the relevance of the documents according to his own subjective standards as to what evidences the conspiracies suggested by the affidavit. (citations omitted).

436 F.Supp. at 697–98. *See also Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949).

It is of no consequence that certain of the materials seized were described with particularity in the warrants. The inclusion in the warrant of certain specifics provided the defendants no protection from violation of their right to be free from general searches. The searches which in fact occurred were no more narrow because of the particulars than they would have been had the particulars not been present at all. *United States v. Burch,* 432 F.Supp. 961 (D.Del.1977).

I note that *United States v. Forsythe,* 560 F.2d 1127 (3d Cir. 1977), cited by the United States for the proposition that a warrant cannot be invalidated where one item is improperly included, deals not with the question of facial overbreadth of a warrant, but with the unrelated question of whether items seized in excess of the specifications of a facially valid warrant need be suppressed.

Finally, the seizures cannot be justified on the basis of the "plain view" doctrine enunciated in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). *Coolidge* permits seizure of evidence not specified in the warrants when, *inter alia,* the agents have "no intention of rummaging around [the defendant's] effects . . . ." *Id.* at 488, 91 S.Ct. at 2049.

> [T]he extension of the original justification [to search] is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.

*Id.* at 466, 91 S.Ct. at 2038.

Few of the items listed on the exhibit list can, by any stretch of the imagination, be termed evidence of criminal conduct. The procedure followed by the agents was, more than anything else, in the nature of an inventory. The United States has not attempted to justify the searches as inventory searches. Thus, I find that the behavior of the agents constituted "rummaging around" the personal effects of the defendants and not a legitimate "plain view" search.

Accordingly, the motion to suppress the materials seized from the defendants' automobiles is granted.

---

**30.** Examination of the government's exhibit list reveals that the only materials seized which were specified in the warrants were maps.

## X.

The defendants have moved, pursuant to Fed.R.Cr.P. 41, to suppress the films referred to in Count II of the indictment and in overt act 59 to Counts I and III [31] and any other material which may have been taken from the alleged co-conspirator Zinyakin on May 20, 1978 at the time and place the defendants were arrested. In addition to the films specified in overt act 59, the defendants argue that all similar films are involved, since the United States' exhibit list does not indicate that they were taken from the persons of the defendants or their automobile. From this the defendants draw the inference that the films were taken from Zinyakin.

The facts material to this motion are uncomplicated. The material sought to be suppressed, a Tropicana orange juice container containing several rolls of 35mm film, was taken from Zinyakin after he had retrieved them from the roadside but before he had completed his return to the car in which Enger and Chernyayev awaited him.

No warrant to arrest or search Zinyakin was issued. The defendants argue that the materials taken from him were illegally seized for lack of a warrant and his entitlement to diplomatic immunity and thus must be suppressed as to them.[32]

The government, in opposition, contends that the defendants lack standing to assert the allegedly illegal search and seizure, and that, even if the defendants have standing, the seizure was reasonable under prevailing fourth amendment standards.

The threshold issue is whether the defendants have standing on this motion to suppress to assert Zinyakin's rights to diplomatic immunity.

The defendants have advanced three separate grounds which, they contend, give them standing: (1) that the defendants' own fourth amendment rights were violated since the allegedly illegal "arrest" of and seizure from Zinyakin took place in their presence, *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); (2) that the seizure was directed at the defendants, thus bringing them within the protection of *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); and (3) that they have "automatic standing" under the rule of *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

I first consider the question of automatic standing.

In *Jones v. United States, supra,* the Supreme Court adopted the rule that where possession of illegal material is an ingredient of the offense, the indictment charging possession provides the defendant with a sufficient interest in the material to establish standing. While the automatic standing rule has come under substantial criticism in light of the Supreme Court's subsequent decision in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), see, e.g., *United States v. Delguyd,* 542 F.2d 346 (6th Cir. 1976), *Jones* remains the law of this circuit. *United States v. West,* 453 F.2d 1351 (3d Cir. 1972). The concept of automatic standing is an exception to the general rule that fourth amendment rights may not be vicariously asserted. *United States v. Riquelmy,* 572 F.2d 947, 950 (2d Cir. 1978), *quoting Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1968).

The standing issue cannot be decided without reference to the allegations of the

---

31. Overt act 59 states: "On May 20, 1978, the co-conspirator Vladimir Petrovich Zinyakin retrieved the Tropicana orange juice carton referred to in Overt Act 57 containing the 35mm films of the national defense information referred to in Count 2."

32. The government concedes that Zinyakin was entitled to diplomatic immunity. [Brief in Support of Government's Answers to Defendants'

Pretrial Motions at 80] The indictment states that it was only because Zinyakin was entitled to diplomatic immunity that he was not arrested along with Enger and Chernyayev.

The motion to suppress on the basis of diplomatic immunity appears to be a matter of first impression. Neither the defendants nor the United States has referred the court to any cases directly on point.

indictment. Counts I and III, which allege conspiracy to violate the espionage laws, obviously do not charge possessory offenses. Count II, on the other hand, alleges that the defendants "did knowingly and wilfully obtain photographic film of a document and writing connected with the national defense of the United States" contrary to 18 U.S.C. §§ 793(b) and 2. Thus, the offense charged is possessory in nature, and the United States cannot be heard to say that the defendants have an insufficient possessory interest to challenge the legality of the search and seizure while simultaneously contending that they have a sufficient possessory interest to uphold a conviction. This "prosecutorial self-contradiction," *see United States v. Riquelmy, supra; Brown v. United States, supra,* has long been condemned. *Jones v. United States, supra.* Thus, the defendants have standing to challenge the legality of the search and seizure as to Count II.

Next to be considered is whether the defendants have standing to move to suppress as to Counts I and III, which do not charge possessory offenses, on the other grounds urged by defendants.[33]

The defendants do not have standing under *United States v. Jeffers, supra. Jeffers* held unconstitutional the warrantless search for narcotics owned by the defendant in a hotel room rented by his two aunts. Neither the defendant nor his aunts were present when the search was made. In holding that the search violated the defendant's reasonable expectation of privacy, the Supreme Court noted that his standing to move to suppress the fruits of the search was "unquestionable." *Id.* 342 U.S. at 52, 72 S.Ct. 93. It has been suggested that *Jeffers* is no longer good law in light of the Court's subsequent holding in *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), although it has not been explicitly overruled.[34] I need not consider that question since *Jeffers* is distinguishable from the instant case. In *Jeffers* the Court based its decision on the fact that the seized material, although contraband, was his property for purposes of the exclusionary rule. It cannot be contended here that the materials taken from Zinyakin constituted the defendants' property. Enger and Chernyayev had never even seen, except perhaps from the car while Zinyakin was retrieving them, the items seized, and thus had no property rights in them. Thus, assuming *Jeffers* to be good law, the rationale of its holding does not confer standing upon the defendants here.

In *Brown v. United States, supra,* the defendants were convicted of transporting and conspiring to transport stolen goods. Police searched the store of Knuckles, a co-conspirator, and seized stolen goods which were admitted into evidence. The defendants, who had "sold" the goods to Knuckles, were not present at the store when the search was made. The acts charged in the indictment were limited to the period preceding the search. The Supreme Court held that the defendants lacked standing to challenge the search: "[T]here is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of

---

**33.** I am mindful of the possibilities of trial confusion which would be created were I to grant suppression on one count and deny it on the others. The Court of Appeals for the Second Circuit recently has recognized the problem.

 A difficult problem in the administration of criminal justice would arise if on a multicount indictment, the Court were to deny standing on some counts and grant suppression on others. The prejudice to a defendant in such a situation could be substantial. On the other hand, it appears anomalous for the government to be in a weaker position on the counts where standing is lacking because the grand jury alleged other criminal conduct.

 Since this case does not raise this troubling issue, we intimate no views on the solution we would adopt in such a case.

*United States v. Galante,* 547 F.2d 733, 740 n.13 (2d Cir. 1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977). *And see United States v. Oates,* 560 F.2d 45, 56 n.7 (2d Cir. 1977). *See also United States v. Riquelmy, supra.*

**34.** *Jeffers* was recently cited by the Supreme Court for the proposition that search warrants are often required for searches conducted outside the home. *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

the contested search and seizure . . ." *Id.* 411 U.S. at 229, 93 S.Ct. at 1569. Here, given defendants' alleged involvement in the specific act charged, it is clear that the search of Zinyakin took place in their immediate presence.

Accordingly, logically extending *Brown,* the defendants have actual standing to move to suppress. *United States v. Galante,* 547 F.2d 733, 739–40 (2d Cir. 1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977); *United States v. Westerbann-Martinez,* 435 F.Supp. 690, 695 (E.D. N.Y.1977).

I now proceed to consider the merits. Since I find that the motion to suppress must be granted as the materials were seized in violation of settled principles of diplomatic immunity, there is no need to reach the question of the seizure's reasonableness.

The law governing diplomatic immunity has been discussed previously in the context of its lack of applicability to the defendants Enger and Chernyayev. *See* Point I, *supra.* The instant motion presents the related question of whether Enger and Chernyayev may successfully move to suppress evidence taken from Zinyakin, who is concededly entitled to the protection of diplomatic immunity. Based upon the United States' recognition of Zinyakin's right to immunity and its knowledge that he was involved in the activities reflected in the indictment, I conclude that no valid search could be made of him. Since the materials taken from him were illegally seized, they must be suppressed. Support for this conclusion is found in 22 U.S.C. § 252, *see supra* at 7, which "deem[s] void" the arrest of a foreign minister and seizure of his personal goods or chattels. Indeed, from 1790 it has been the law of the United States that violation of 22 U.S.C. § 252 is a criminal offense. 22 U.S.C. § 253. As has been previously noted, Point I, *supra,* the policy underlying 22 U.S.C. § 252, the facilitation of relations among nations, requires that the statute be generously construed as declarative of the international law of diplomatic immunity. In light of the full immunity due Zinyakin under the statute, I must construe "goods or chattels" in a manner coextensive with the scope of immunity provided by the statute.

Had this matter involved the limited immunity provided, for example, under the International Organizations Immunities Act, 22 U.S.C. § 288d(b), existing precedent would support the view that personal "goods or chattels" would not protect from seizure goods used for unlawful purposes. *See United States v. Melekh,* 190 F.Supp. 67 (S.D.N.Y.1960). This, however, is not the case.

The government argues that suppression on the basis of diplomatic immunity will expand the protection of diplomatic immunity to persons to whom its protection is not contemplated by statute, treaty, or international custom. The argument has considerable persuasive force. However, to deny suppression here would contravene provision of the full immunity provided by the statute.

Further support is found in Article 29 of the Vienna Convention, which states: "The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention." It is undisputed that Zinyakin was in some way detained by the FBI agents who seized the Tropicana carton and its contents, although counsel differ on how that detention should be characterized. The United States contends that some limited detention was necessary to confirm Zinyakin's identity and entitlement to immunity. In so doing, the United States argues that the agents acted according to established procedures for treatment of foreign officials. Assuming that the United States did act properly, confirmation of identity was the outer limit of the permissible scope of his detention under the Vienna Convention. Thus, I find that no seizure of anything in his possession could legally be made during his detention.[35] Since the sei-

---

35. Zinyakin apparently was not carrying a weapon, nor is there anything of record to indicate that the FBI agents thought he was. I express no opinion whether the agents legally could have seized a weapon from Zinyakin, had he been carrying one, for their own protection.

zure was illegal, its fruits must be suppressed.

None of the theories offered by the United States in opposition to the motion is persuasive. The United States argues that a search incident to the functional equivalent of an arrest satisfied fourth amendment requirements. *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). *See Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). *Cupp,* upon which the United States relies heavily, held that the taking of fingernail scrapings from a murder suspect who had not been formally arrested was justified because the police had probable cause to arrest even though they did not do so. *Cupp* does not aid the United States' position for the simple reason that the protective cloak of diplomatic immunity operates without reference to the existence or nonexistence of probable cause. The existence of probable cause to arrest a diplomatic agent may be indisputable, but the law is clear that he may not be arrested. 22 U.S.C. § 252. I find no reason to distinguish the situation in which there is probable cause to conduct a search.

The same objection, that the protection of diplomatic immunity overrides otherwise legal searches and seizures, is validly interposed to the United States' argument that the seized material was in plain view. The prohibition of the immunity is absolute. Moreover, the United States has submitted no affidavit in support of its contention, made only in its brief, that the Tropicana carton was in fact in plain view. Thus, there is no factual basis upon which I could uphold the United States' theory were I inclined to do so.

For the foregoing reasons the motion to suppress all materials seized from Zinyakin is granted as to all three counts.

## XI.

The defendants next argue that the videotapes and recordings of the defendants were made in violation of their constitutional rights.

I find this contention without merit based upon the unrefuted claim of the United States that the videotapes were made of the defendants while they were in public places where they could have no legitimate expectation of privacy.

As to the tape recordings, the United States represents that they were made with the consent of the confidential source who was a party to the conversation recorded. *See Lopez v. United States,* 373 U.S. 427, 437–39, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

Accordingly, the defendants' motion to suppress videotapes and recordings of their activities and recordings is denied.

## OPINION ON MOTION FOR RECONSIDERATION

There follows my opinion on the motion by the United States for reconsideration of so much of my decision of August 8, 1978 as relates to Points IX and X.

## IX.

The United States having moved for reconsideration on defendants' motion for suppression, the motion is granted and, upon reconsideration, the defendants' motion to suppress is denied.

I was, upon initial consideration, concerned over the seeming generality of the warrant, since (as I noted in my opinion of August 8, 1978) as I perceived it from the submissions before me at that time, it seemed that the searching agents themselves had been unable to define what items were covered by the warrant and had seized everything in the defendants' automobiles. The subsequent information produced by the United States, and the evidentiary hearing held before me on the motion for reconsideration, convince me that my initial determination must be revised.

The initial search, it now appears, left untouched numerous items in the de-

fendants' automobiles. Thus my earlier determination that the agents "perceived no limit in the warrants on the scope of the searches," must now be revised. They did in fact recognize the limits inherent in the warrants. Accordingly, I reconsider my earlier ruling and deny the motion to suppress that material obtained from the automobiles on May 20, 1978.

As to the later searches, conducted in June 1978, resulting in the returns of June 28, 1978, my examination of the returns of said materials leads me to conclude, as I have already noted, that the items seized did not fall within the scope of the warrants. Indeed, as I have noted, the F.B.I. agents conducting the searches recognized this when they conducted the initial searches. This is why the materials were left in the automobiles.

The United States seeks to justify the second searches by claiming that they were made, at least in part, because the defendants' counsel made a request of the United States that it list all of the materials taken from the automobiles. In connection with the motion for reconsideration, I conducted an evidentiary hearing to resolve a dispute over whether in fact such a request was made. After hearing the testimony of respective counsel for the United States and the defendants, I conclude that the United States believed that such a request was being made of it and that this belief played a substantial part in the United States Attorney ordering the second searches. While I have substantial doubts about the relevancy of the materials then seized to the issues in this case, I will at this time, upon reconsideration of my earlier decision, deny the motion to suppress these items.

Nothing stated herein is intended to reflect upon the credibility of the witness called by the defendants at the evidentiary hearing. Additionally, by expressing doubt as to the relevancy of the materials seized in June 1978, and not addressing the relevancy of the items seized on May 20, 1978, I do not intend to reflect a belief that the earlier seized items are relevant or irrelevant, in whole or in part.

## X.

The United States has moved for reconsideration of my determination granting the defendants' motion to suppress materials taken from the alleged co-conspirator Zinyakin on May 20, 1978. On this motion the United States has presented facts not previously revealed to the court, chiefly through the affidavits (with attachments) of F.B.I. Special Agents Pass and Keary-Taylor, and the supplemental affidavit of Mr. Pass. These cast an entirely different light on the matter. Moreover, counsel, by prodigious research, have unearthed judicial precedent and writings in international law which I find most persuasive. Accordingly, the motion for reconsideration of my decision of August 8, 1978, granting the defendants' motion to suppress all items seized from Zinyakin is granted, my previous decision is vacated, and the motion to suppress is denied.

No warrant to arrest or search Zinyakin was issued. The defendants argue that the materials taken from him were illegally seized for lack of a warrant and his entitlement to diplomatic immunity and thus must be suppressed as to them. The United States concedes that Zinyakin was entitled to diplomatic immunity; however, it also contends that the defendants lack standing to assert the alleged illegal seizure and that the seizure was in any event reasonable.

I have now had an opportunity to review the various writings and other materials which allegedly were part of the charged unlawful acts of the defendants, and which, the United States contends, were received from them by the "Navy officer" [hereinafter the "source"] from September 1977 up to and including May 20, 1978. I have also now seen certain film and videotape which the United States alleges depict the defendants' charged activities, and I have heard recordings of certain telephone conversations which the United States alleges were

between the source and "Jim," acting on behalf of the defendants.[1]

Thus, I have now reviewed and considered, in addition to the materials submitted previously and referred to in my opinion of August 8, 1978, the following exhibits: G–200, 303, 403, 408, 409, 502, 506, 508, 610, 611, 711, 713, 707A and B, 801A and B, 905A and B, 708A and B, 810, 811A and B.[2]

There is no need to quote extensively from the writings or the telephone conversations. It is sufficient to state that the submitted materials show that the originator or originators of the writings to "Ed," the source, had an extensive knowledge of the weaponry of the United States, were expert in establishing a secure chain of communications with the source, had vast sums to pay the source for secret information he might pass to them, were concerned about the 25-mile restriction upon their travel (without notice to the State Department) and wanted to establish one or more meetings with the source outside the United States. Their skill in what would be necessary to purloin classified national defense information was also manifested.

I shall accordingly now deal in detail with just a small sample of the materials recently submitted by the United States on its motion for reconsideration, assuming them, and the inferences reasonably to be drawn from them, to be true for purposes of this motion.

Thus, on March 11, 1978 the source, by virtue of instructions received on February 18, 1978 [G–713, para. 10], had a telephone contact, allegedly with the defendants, at the Cheesequake Service Area on the Garden State Parkway. The conversation as recorded is reflected in a transcript, which I find accurately reflects the conversation, as follows [G–801B]:

CALLING PARTY: Very good. Now, Ed, . . . uh . . . right now you are on the west side of that alley, right?

NAVY OFFICER: On the west side, yes.

CALLING PARTY: Now, you proceed to the east . . . uh . . . side and you'll see the . . . uh . . exactly the same telephone booth there.

NAVY OFFICER: Yes.

CALLING PARTY: In the middle one.

NAVY OFFICER: Yes.

CALLING PARTY: In the middle one, the last number is 36, . . . under the shelf, you'll find a small package wrapped in a black paper, and . . uh . . . sticked to that shelf . . uh . . . with a scotch. Just pick it up and proceed according to the-e-e instructions. OK? [sic]

NAVY OFFICER: OK.

CALLING PARTY: As always, and then you'll find exact time when we'll . . I will be calling you again, at the very end. OK?

NAVY OFFICER: At the very end, huh?

CALLING PARTY: Yeah.____

NAVY OFFICER: All the instructions will be over on the other side.

CALLING PARTY: Right . . . right, over there. And . . . uh . . . do exactly as it is said over there. And, in any case, try to wait for my call. OK?

NAVY OFFICER: OK. Now that's the middle phone, number thir . . ., last digits num_____. [sic]

---

1. The recordings and videotapes were received, with other materials, with the supplemental affidavit of Mr. Pass, dated August 18, 1978. Because this submission was after oral argument on the motion for reconsideration, I gave defendants until August 22, 1978 to decide whether they were prejudiced by the submission and would object to it. They did object, but I found no merit to their claim of prejudice. In this regard, the recordings had been heard by their counsel several weeks before and the

videotapes had been seen by them and copies given to them at least several days previously. The additional writings for the most part they had seen or had the opportunity to see, having been alerted to same by the inclusion on the government's exhibit list. *See* Transcript of August 22, 1978 at 23–27; 74.

2. The supplemental Pass affidavit also submitted G–970, 941, 1061, 1062, 1063 and 1064. I have not considered these on the motion.

CALLING PARTY: The last two numbers is 36. It's just middle. You know there are three booths?

NAVY OFFICER: Yes.

CALLING PARTY: And that one is just in the-e mid . . . in between.

NAVY OFFICER: OK.

CALLING PARTY: OK?

NAVY OFFICER: Real fine.

CALLING PARTY: Um um. OK, Ed____

NAVY OFFICER: I'll call____

CALLING PARTY: (inaudible)

NAVY OFFICER: I'll call you later on then.

CALLING PARTY: No need to call____

NAVY OFFICER: Oh, you'll____

CALLING PARTY: I'll call you myself.

NAVY OFFICER: You'll be calling me?

CALLING PARTY: Right.

NAVY OFFICER: OK.

CALLING PARTY: OK. Bye-bye.

NAVY OFFICER: Bye.

Thereafter, following the foregoing instructions, the source was led to a cache on Fulner Street, South Amboy, New Jersey, where he picked up materials allegedly left for him by the defendants.

Included in these materials was the following communication, allegedly from the defendants, to the source [G–804]:

Dear Ed,

In this letter I would like to point out the following.

I. You understand properly the conditions for our permanent contact. Just always remember them.

2. The conditions for an emergency call from us are acceptable as well. And of course we'll never use them unless it is a real case of emergency.

3. The conditions of your emergency call for a meeting are being considered now and we will let you know them later.

4. We have roughly evaluated the latest materials received from you. Enclosed, please, find $3000 for them. By the way, have you paid attention to my request to pass over to us the films of latest documents dated I976–I978 [sic], if possible?

5. Our next operation will take place on May I3 [sic]. Alternate date—May 20. For the provisional contact we will use the telephones on the east outside of "A & P" store, located on road # I [sic], near exit # I30 [sic] from GARDEN STATE PKWY. (See the map below.) Wait for my call there at the usual time. Phone numbers: 225–9860, 2259855 [sic].

6. For that operation, please, try to prepare materials on submarine acoustic detection systems.

7. Use a package from "TROPICANA" as a container for your materials.

8. The new schedule for operations will be handed over to you in MAY. It will be planned on the basis of one operation every other month. (I. e. 6 operations a year.)

Please, make the necessary notes & destroy this letter. *In no case keep my letters.*

Best wishes,

Jim.

Also bearing on the March 11, 1978 contact is the information conveyed by the source and others to the F.B.I. agent who filed the complaint. This information is best set forth by quoting from the complaint, as follows (pp. 8–10):

On March 11, 1978, the confidential source advised the complainant that on that date at about 2:01 p. m. he was called at a public telephone at the Cheesequake Service Area, Garden State Parkway, by an unknown male caller identifying himself as "Jim," who instructed him to retrieve a container secreted under the shelf of a specified public telephone booth in that area, and to read and follow the instructions contained therein. "Jim" told the confidential source he would call him again at the phone identified in the written instructions.

Pursuant to instructions the confidential source retrieved this container which contained a typewritten letter from "Jim" which instructed the confidential

source that "To-day we'll have the same kind of the operation we had last time" and directed him to proceed to the drop site at "the third lighting pole." The confidential source followed these instructions and retrieved a red "Martinson" coffee can from the base of the third pole on Fulner Street in South Amboy, New Jersey and deposited his camouflaged milk carton containing exposed film of documents at that same location at about 2:25 p. m.

The confidential source advised that in this coffee can were secreted $3,000 in U.S. currency and a typewritten letter from "Jim," which stated in part as follows:

"We have roughly evaluated the latest materials received from you. Enclosed, please, find $3000 for them. By the way, have you paid attention to my request to pass over to us the films of latest documents dated 1976–1978, if possible?"

"Our next operation will take place on May 13."

"For that operation, please try to prepare materials on submarine acoustic detection systems."

The complainant personally observed and was advised by other Special Agents of the Federal Bureau of Investigation who participated in this investigation that on March 11, 1978 a gray Dodge bearing New York license 155–QXR was observed driving around in the vicinity of the third pole on Fulner Street in South Amboy, New Jersey, immediately prior to the time when the confidential source deposited his container of documents at the base of this third pole. Also defendant ENGER was the driver and co-conspirator ZINYAKIN was a front seat passenger in this Dodge. Shortly after the confidential source had deposited his container of documents, Special Agents of the Federal Bureau of Investigation who participated in this investigation advised the complainant that they observed the following at about 2:26 p. m.:

The above gray Dodge with defendant ENGER driving and co-conspirator ZIN-YAKIN a front seat passenger approached and stopped near the above third pole where co-conspirator ZINYA-KIN walked quickly to the above third pole where he picked up the milk carton of filmed documents and immediately entered the rear seat behind defendant ENGER who then drove north on Fulner Street.

The confidential source advised the complainant he received a subsequent telephone call that day at another public telephone booth from "Jim," who acknowledged that he had received the documents and May 13 was confirmed as the date for the next operation.

The complainant was further advised by other Special Agents of the Federal Bureau of Investigation who participated in this investigation that on March 11, 1978 they observed the following:

At about 2:31 p. m., defendant ENGER, alone in the gray Dodge, was observed driving around a traffic circle near exit 125 of the Garden State Parkway; at about 2:37 p. m., defendant ENGER alone was observed in this gray Dodge at the Cheesequake Service Area; at about the same time, a light blue Dodge bearing New York license 480–GPF, drove into the Cheesequake Service Area driven by defendant CHERNYAYEV and occupied in the front passenger seat by co-conspirator ZINYAKIN. Shortly thereafter, defendants ENGER and CHERNYAYEV and co-conspirator ZINYAKIN were observed at that same location carrying on a very animated conversation. Defendant CHERNYAYEV and co-conspirator ZINYAKIN then left together in the above blue Dodge and defendant ENGER followed immediately in his gray Dodge with both vehicles travelling northbound on the Garden State Parkway.

Prior to May 20, 1978, the source photographed the classified document referred to in Count 2 of the indictment, was seen by the F.B.I. placing the negatives into five film canisters, and, in accordance with the instructions received from "Jim" on March

11 in the Fulner Street cache, placed the canisters into a "Tropicana" container, which was then sealed. See G–804, para. 7. On May 20, further in accordance with the aforesaid instructions, the source then drove off in his automobile to the A & P in Fords, New Jersey [G–804, para. 5], there to be telephoned by "Jim."

Contemporaneously, the F.B.I. agents drove to vantage points near the aforesaid A & P store. Thus at 12:42–12:43 p. m. they saw Enger drive his automobile into the A & P parking lot with Zinyakin in the front right seat, with Chernyayev following immediately behind in his automobile. The two cars parked side-by-side in the A & P parking lot.

At 1:50 p. m. the source entered the A & P parking lot, parked his car, and eventually placed himself near the east wall telephones.

At 1:54 p. m. Zinyakin handed an object to Chernyayev who, in his car, drove to another location in the parking lot, got out of his car, and deposited an object at the base of the southeast corner of the A & P building. He then returned to his car and drove out of the parking lot at 1:56 p. m., proceeding to the "dropsite" in Woodbridge (see G–907, infra).

The call, allegedly by Enger, at "the usual time" (2 p. m.) [G–804, para. 5, supra], was observed by agents to be made at about 1:59 p. m. from a telephone on the north outside wall of the A & P store, after Enger left his car and walked to that location. Simultaneously, the source, presumably hearing a ring on an east wall telephone, picked up the receiver and a telephone conversation ensued which, with the source's consent, was recorded and transcribed (G–905B).[3] As the transcript shows, "Ed" [the same name used by the writer of the written communications, G–803 and 804, to address the source], after being greeted by that name, was directed to go to "the other side of the building" and pick up an "A & P whipped cream [container]." He was also told "before going any place please do read carefully the questionnaire we gave you. OK?" (G–905b). The caller, allegedly Enger, as I have noted, added "[e]verything is like . . . ah . . . in previous times. OK? . . . and you'll find everything in, and I'll call you next time you know what, when and where. OK?" Id.

At 2 p. m. the brief conversation ended and the source, pursuant to the instructions just received, walked directly to the southeast corner of the A & P building and, at the same location where Chernyayev had just been observed depositing an object, picked up a whipped cream container containing more instructions from "Jim." G–907, G–915.

G–907, again addressed to "Ed," reads:

DEAR ED,

1. Thoroughly examine the map & sketches.

2. Right now you are at point "A" [on the map]. After reading the instruction proceed to point "B"—place of DLB. Your route there: route # I (north),[4] right turn at the first traffic signal to Woodbridge Center Drive, right turn to Highview Dr. (See the map.)

3. Place of DLB [Dead Letter Box—see G–508, para. 1] beyond the group of three trees which will be on your left. (See the picture "B")

4. Pick up our container & at the same place leave your container. Our container—crashed [sic] can from pears— "BARTLETT PEARS" ANN PAGE. Colour—yellow & green.

5. While loading & unloading DLB see to it that there are no people near you. Better wait till the area is clear.

6. Immediately leave this place & proceed to point "C"—public telephones (# # 636–9868, 636–9866) located be-

---

3. I have listened to the recording. The transcript, with minor exceptions, is accurate.

4. It will be noted that "Jim" always used "I" for the number "1".

tween the doors of the entrance of "STERN BROTHERS" STORE. (See the sketch.)

I'll call you there at 2.25 p. m., and then at 2.30., 2.40., 2.50 p. m., 3.00 p. m., 3.30 p. m.

BEST OF LUCK TO YOU
JIM

G–915 reads:

Hello,

At present we are making the necessary arrangements to prepare our personal meeting with you in Europe, in Austria. Therefore before you go on with our todays [sic] operation, please, answer the following questions & enclose this list in your container. *Only after this* start moving on your route to DLB and farther on to the telephones.

QUESTIONNARY [sic]

I. Are you planning to spent [sic] your vacation this year outside the USA? Where? _____

name the country, give dates

2. Do you have any particular plans for this vacation? ____YES. ____NO.

3. Have you discussed them with your wife & your family? ____YES. ____NO.

4. Do your friends know about your plans? ____YES. ____NO.

5. Have you discussed them with your chief? ____YES. ____NO.

6. DO [sic] you plan to stay for vacation in the USA? ____YES. ____NO.

7. Can you change your plans? ____YES. ____NO.

8. Can you spend your vacation overseas? ____YES. ____NO.

9. Can you spend your vacation in Austria? ____YES. ____NO.

I0. Can you go there along? [sic] ____YES. ____NO.

II. Can you go there only with your family? ____YES. ____NO.

I2. How long will it take you to arrange your vacation aboard? [sic] ____ days. ____DONT [sic] KNOW.

I3. Do you have to inform your chief about this? ____YES. ____NO.

I4. Have any of your colleagues ever spent their vacation overseas? ____YES. ____NO. ____DON'T KNOW.

I5. Will such a trip arise [sic] any suspicion on the part of your acquaintances and collegues? [sic] ____YES. ____NO. ____DON'T KNOW.

---

If you have some additional info concerning your vacation please, use reverse side.

THANK YOU.

Zinyakin drove Enger's car from its parking place to the telephone where Enger allegedly had just concluded his telephone conversation with the source. Enger got in the driver's side and both left the lot at about 2:04 p. m.

The source, after having picked up his instructions in the whipped cream container, returned to his car and alerted the F.B.I. to the location of the "dropsite" in Woodbridge as described in G–907. Thus the agents were already at that locale as the source arrived. In fact, agents had spotted Chernyayev there, at the clump of trees described in G–907 (para. 3) at the designated "dropsite," shortly before the source got there. The source went to the spot desig-

nated in the instructions allegedly left by Chernyayev [G–907], where Chernyayev had been observed just shortly before, and picked up the "Bartlett Pears" can which, I assume the United States will argue, was deposited by Chernyayev. Also pursuant to the instructions, the source, at the same time, deposited the Tropicana box (with the film in it) and then drove off to the Stern's department store. The "Bartlett Pears" can [G–903] contained still another typewritten letter [G–911] from "Jim" and $4,000 in $20 bills. G–911 reads:

Dear Ed,

On behalf of my Headquarters I would like to inform you that we appreciate your work and are interested to continue our mutual cooperation. However to make it more fruitful we need to know in detail the range of problems you are deal-

ing with daily. Therefore I would ask you to describe it in more details once again. In addition supply your next letter with films of documents (requests, replies, etc.) passing through your desk routinely.

2. As for the information I'd like to point out that we are also interested in documents dealing with the purposes and tasks of different scientific reseaches [sic] as well as experimental and constructive works carried on at your base (their titles, brief contents), secret plans and reports related to these questions. Do you have access to such documents and can you pass them over to us in films or written rendering of their basic points? We will pay for such documents sufficiently more compared to the material received from you earlier, provided they are new and have an appropriate classification.

3. The latest information received from you have [sic] been evaluated for $4000. Enclosed, please, find them. Sure this is not little money. But I'm convinced that you can make even bigger money if we could discuss the above mentioned questions (point # I & especially point # 2) with you personally.

4. That's why at present we are studying the possibility to arrange a personal meeting with you overseas, maybe in Europe & in particular in AUSTRIA. At this meeting besides the above mentioned questions we would also like to give you some advice concerning your security. In our opinion this work can be accomplished for 2 days working 3–4 hours a day. Certainly we understand that you may have some difficulties in arranging such a trip this summer. Therefore we ask you to thoroughly study this matter and give us your opinion in the next letter. If you have an opportunity to make a trip to Austria this summer,

please, advise the date of departure from the USA and the arrival date in Austria.

5. Let me give you some advice in this connection:

You should not go to Austria direct from the USA. Your itinerary should provide I–2 stopovers in other countries for several days and arrival in Austria for example from Spain, West Germany or Switzerland. Please, take this into consideration when planning the trip to Austria.

6. Taking into account the fact that you might have an opportunity to arrive in Austria this summer we are planning to carry on our next operation with you on JUNE I0. *Alternate date: JUNE II.* Usual time. At this operation, please, pass over to us your schedule and itinerary with the dates indicated. Try to plan it so that it would enable you to stay in Austria 5–6 days. On our part during this operation we'll pass you the money for the trip and the conditions of meeting in Austria.

N.B. If you are not able to go to Austria this summer there will be no need for the operation in June. Consider it as cancelled. I. e. our next operation will take place due to the new schedule—in August.

7. For our next contact we'll use public phones # # 494–9757 & 494–9760 of SUNOCO GAS STATION located beyond the intersection of route # I & PARSONAGE rd. (see the map below).[5] Wait for my call there at usual time.

8. To the next operation, please, try to prepare information on sea launched cruise missiles—SLCM.

9. As a container for your material, please, use a crashed [sic] package from any fruit juice.

10. We have prepared the following schedule for our next operations:

---

5. It is noted here that "Jim" customarily would have had to scout the area well in advance of a meeting. Thus in May he has prepared typed instructions for a June or August contact, including the numbers of public telephones he would call to reach the source. The same pattern exists throughout the period covered by all of the writings now before me.

| AUGUST | OCTOBER | DECEMBER |
|--------|---------|----------|
| 19 [26] | 14 [21] | 9 [16] |

In brackets the alternate dates of operations are given.

Will these dates be suitable to you?

THANK YOU,

JIM.

At about 2:19 p. m. Enger, with Zinyakin, having been parked nearby, drove up to the dropsite. Zinyakin got out and picked up the Tropicana carton and placed it in a brown paper bag. Before he could return to Enger's car, he was approached by Special Agents Pass and Davidson. Pass observed the Tropicana carton sticking out from the top of the bag and "knew this carton contained five film cannisters containing films of national defense information." Pass Affidavit, para. 13. Davidson, who, as noted, was with Pass, took the bag containing the Tropicana carton from Zinyakin and, at the scene, the carton was opened, and the five film canisters, turned over to the source earlier that day by the F.B.I., were observed. At about the same time Chernyayev and Enger were placed under arrest pursuant to arrest warrants which I have held to be valid.

As I have noted, much of the foregoing had not been presented to the court earlier. This information must be considered along with other facts adverted to in my opinion filed August 8, 1978, pp. 514–519.

Thus after sightings of the defendants (and a contact) between September 1977 and January 1978, there was a contact on February 18, 1978, as to which, relying upon the complaint, I previously wrote (p. 517):

At 2 p. m. on February 18 the confidential source received a telephone call at the Brookdale Service Area on the Garden State Parkway. He was directed to a specified telephone booth immediately south of the Essex Toll Plaza on the Parkway, where a package for him was located under the shelf. Following this direction, he retrieved a container within which were written instructions from "Jim" and a map. These instructions in turn led him to an area in East Orange, New Jersey, where he deposited cans containing films of documents and picked up a can containing a letter and $3,000 in currency for the materials he had passed on January 7, 1978. This letter, among other things arranged the next meeting on March 11, 1978. The confidential source then drove to still another location on the Parkway where he received another telephone call from "Jim," acknowledging receipt of the materials just deposited in East Orange and confirming the March 11 meeting.

While at 2 p. m. on February 18, 1978 the confidential source was getting a call directing him to the Essex Toll Plaza location, Enger was seen to get out of his car (occupied also by Chernyayev and Zinyakin) at that location and make a telephone call, of two minutes' duration, during which he was observed placing his hand under the shelf in the booth. The magistrate could have concluded, in view of the surveilling agents having inspected the underside of the shelf after Enger left the area, and having discovered a magnetic container in which was secreted a letter to the confidential source from "Jim," that it had been placed there by Enger.

Thereafter, while the confidential source was placing his film and getting the $3,000 at the East Orange location, agents saw Enger's car, with Enger and Chernyayev in it, in the same area. The magistrate could have properly concluded that Enger and Chernyayev, having picked up the film, were then able to stop at a telephone and call the confidential source at a prearranged place and acknowledge receipt of the materials and confirm the date of the next meeting.

**534**

The transcript of the February 18 telephone conversation at 2 p. m., as submitted by the United States, reads [G–707B]: [6]

NAVY OFFICER: Good Afternoon.

CALLING PARTY: Ah, Ed?

NAVY OFFICER: Yes. . . . JIM?

CALLING PARTY: Hi. How are you, Ed? OK?_ _ _ _

NAVY OFFICER: Fine, thanks.

CALLING PARTY: Do you have the stuff?

NAVY OFFICER: Yes, I do.

CALLING PARTY: You do! . . . OK, Ed, now you know what? Uh . . . . proceed now to the south and just after the Essex Toll plaza . . .

NAVY OFFICER: Yeah.

CALLING PARTY: You'll see the phone booth—public phone booth.

NAVY OFFICER: Uh huh.

CALLING PARTY: Now the second phone booth from the right if you look at the, in front of you, you know, af . . . after the booth. Ah, the number is . . . uh . . . seven, four, eight . . . .

NAVY OFFICER: Seven, four, eight . . . .

CALLING PARTY: Nine, six . . . . .

NAVY OFFICER: Nine, six . . . . .

CALLING PARTY: Eleven.

NAVY OFFICER: Eleven.

CALLING PARTY: Yeah, Just under the shelf you'll see the small box. OK?

NAVY OFFICER: OK.

CALLING PARTY: As always. And . . . uh . . . follow the instructions completely, and you'll find everything there. Alright?

NAVY OFFICER: Will you be calling me there?

CALLING PARTY: Pardon me?

NAVY OFFICER: Will you call me at that_ _ _ _

CALLING PARTY: Nope. No. You'll read everything we just put in there.

And we'll get together again, you know, I'll call you at the very end and you'll find time . . . the time and you'll find the . . . uh . . . the number. OK?

NAVY OFFICER: OK. You'll call me at the end, then?

CALLING PARTY: Yeah.

NAVY OFFICER: OK.

CALLING PARTY: You'll find the number where I will call you.

NAVY OFFICER: Yes.

CALLING PARTY: OK, Ed? So, Essex Plaza, just behind the toll at Essex Plaza if you go to the south right now.

NAVY OFFICER: OK.

CALLING PARTY: OK.

NAVY OFFICER: Right; I'll . . . talk to you later.

CALLING PARTY: Um hum. OK_ _ _ _

NAVY OFFICER: Bye.

CALLING PARTY: Bye-bye.

The two letters received by the source on February 18, 1978 read as follows:

Hello, Ed

Please, read this letter, thoroughly examine the map & pictures. While acting— check all your steps with the instruction.

I. Right now you are at the place marked at the map as "A".

2. After reading the instruction proceed to point "B"—place of DLB. Your route there will be: GARDEN STATE PKWY (south)—exit # 147—N.ORATON pkwy (south)—left turn to FREEWAY dr.E.

3. Park your car at FREEWAY dr. behind "EXXON" gas sta.

4. Go to the place of DLB. It is in between the stone wall & the staircase. (See the pictures.)

5. Pick up our container & at the same time leave your containers. Our container—crashed [sic] can from peanuts—"Superior's CASHEW PEANUT CRUNCH". Color—metallic blue.

---

**6.** Again, having heard the recording, I can state that the transcript accurately sets forth the conversation.

6. Immediately return to your car & proceed to point "C". Your route there will be: GARDEN STATE PKWY (south)—service sta. (gas, phones) before exit # I3I. Wait for my call near the phones located just opposite "ARCO" gas station. (See the picture.) I'll call at 2.50 p. m. In case you are late I'll repeat the call at 3.00 p. m., then 3.05, 3.I0, 3.I5, 3.20, 3.40p. m. [sic]

7. You will not be able to open our container immediately & read our letter. So, please, be ready to confirm the date of our next operation.

8. As it was given in our schedule we plan it on MARCH II. Alternate date— MARCH 18. Usual time. In case its [sic] all right just say: "Everything is O.K.".

9. Our next operations will be much closer to your home.

Best of luck to You [sic]

Jim.

Hello, Ed

I'll begin my letter by answering your questions.

I. We agree that at present our operations are being carried on rather far from your home. But it is caused by security precautions. More over, [sic] the farther you are away from home the less are the chances of your meeting anyone of your acquaintances at the place of operation, who might from pure curiosity wonder why you were there.

However, we understand your feelings and we'll look into the matter in order to enable you to spend less time to get to the place of operations.

2. In this connection we also suggest to carry on our operations not each month but every other month, i. e. 6 times a year. This plan has some advantages. It will enable you to have more time for filming, for picking up more valuable documents. Besides, you will be away from home only 6 times a year, which will not be so conspicuous for your close relatives and friends. As far as the payment is concerned you will not lose anything, because having more time you will be able to prepare more materials to hand over to us for which we'll naturally pay more money. If you agree to carry on the operations once every two months— let us know in your next letter. Be sure also to indicate in it what time you are planning your vacation in order to enable us to keep this in mind while planning a new schedule of our operations.

3. You make good films from the documents, they are quite readable and this is O.K. with us. Therefore there is no need to turn back to xerox copies.

4. As you have never taken microfiches—there is nothing to be done. Just forget about it.

5. Now, about the documents which we received last time. The first document is complete and we evaluate it for approximately 3 thousands [sic]. (Enclosed, please, find $3000.) As for the second document, we got only half of it and it is very difficult to evaluate it without the second part[.] Therefore we are not sure right now how much we should pay for it. We hope to get the second half right now—during this operation. If not—pass it over to us in March. In any case be sure that you'll get payment for the second document but as you understand the complete document worth more than incomplete one. [sic]

6. If you have passed the second half of this document right now for the operation in March, please, try to film some of those 3 documents mentioned in our letter in January. In case you have no access to them—film any secret documents dealing with the subjects pointed out in our letters in October & December.

7. Practically all the documents we have received from you up till now were dated I973 or I974. Do you have access to the I977–I978 documents? Can you film them? As a rule up-to-date materials are worth more than the aged ones even though they still maintain their actual value. The same thing with the classification.

8. Still one more request. Please, acknowledge in your next letters the date of our next operation so that there will be

no need to discuss this matter over the phone.

9. As a container for your materials next time, please, use an empty package from milk. To make it look like real trash just scrape the package put some glue on it and then powder with some sand, soil or dust.

I0. For our next operation we'll use public phones inside the CHEESEQ-UAKE SERVICE AREA, located at the GARDEN STATE PKWY before exit # I25 (while driving northbound). We'll use # # 72I–9839, 72I–9840, 72I–984I. Please, wait for our call there on MARCH II from 2 p. m. till 2.I0 p. m. Alternate date: MARCH I8, same time.

Thank You

Jim

The facts newly presented, assuming their truth for purposes of this motion, are significant not only in and of themselves but for the light they cast upon what had been previously presented. From the total presentation the following picture is developed.

Chernyayev and Enger were the prime movers in the enterprise described by the United States as espionage against the United States. I had earlier described the role of both to the extent that such was revealed by the averments then at hand. *See* Opinion of August 8, 1978, pp. 515–519.

Prior to the May 20, 1978 events critical to this motion, both defendants were seen repeatedly in the areas where contacts were to be made with the source. Except perhaps on one occasion, each drove his own automobile. Not having had the benefit of the latest affidavits of Messrs. Pass and Keary-Taylor, I had inferred from the constant presence of both that they were furnishing a "back up" for each other and Zinyakin. *Id.*, pp. 515–516. The recently submitted materials now suggest a different reason for their joint presence on previous occasions. The pattern of (a) leaving instructions near the first contact point (arranged by instructions given on the day of the previous exchange) required that En-ger, who, it can now be reasonably inferred, used the name "Jim" on several occasions, be at a telephone not far distant from the telephone the source had been directed to, on May 20, for example, the telephone in the east wall of the A & P; on March 11, the Cheesequake Service Area on the Garden State Parkway; and on February 18, the Brookdale Service Area on the Garden State Parkway [while "Jim" called from the Essex Plaza]; and (b) that Chernyayev be available to leave the next instructions, or the final "drop," at the site to which Enger would direct the source.

Thus the place to which the source was to report to receive his initial telephone call was in each instance established by written instructions, signed by "Jim," received by the source on the previous contact. To repeat what has already been noted, he was told prior to February 18 to report at the Brookdale Service Area at 2 p. m. on February 18. On February 18 he was told to report at 2 p. m. on March 11, 1978 at the Cheesequake Service Area. On March 11, 1978 he was told to report on May 13 or, as an alternate date, May 20 to the east outside of the A & P store, located "on road [sic] # I, near exit # I30 from GARDEN STATE PKWY. . . . Wait for my call there at the usual time." Parenthetically, the instructions received on March 11 also told him that he would get a "new schedule for operations" in May and that "it will be planned on the basis of one operation every other month." Thereafter, when he got his instructions on May 20, he was told that, subject to the proposed trip to Austria, "we are planning to carry on our next operation with you on JUNE I0. Alternate date: JUNE II. Usual time." He was told to report at a public phone, the number of which was given, located at the Sunoco Gas Station "beyond the intersection of route # I & PARSONAGE rd. (see the map below). Wait for my call there at usual time."

Except for the first few letters, each one of the letters embodying the instructions for the next meeting was signed by "Jim." This is also true of the interim writings that

were passed to the source after he received the initial telephone call at the outset of a particular contact. Thus, for example, as G–907 reflects, the instructions picked up at the southeast corner of the A & P building, directing the source to the dropsite, were signed by "Jim." Also undenied are the averments of the United States that the person who telephoned the source identified himself as "Jim." Assuming the truth of the sworn allegations before me, it is clear that "Jim," identified by the United States as the defendant Enger, at times, played a principal role in bringing about the various contacts between the source and the persons, stated by the United States to be the defendants, who were allegedly engaged in espionage activities.

As I have also noted, the significance of Enger's role is underscored by his acting at each and every meeting in a prominent capacity, according to the affidavits before me, and always driving his own automobile. Moreover, given the contents of the letters, it may reasonably be inferred that the writer was not a mere messenger, but rather exercised substantial authority in orchestrating the contacts. Thus, in the instructions given to the source on May 20, contained in the "Bartlett Pears" can (see Keary-Taylor Affidavit, para. 12), along with the $4,000 in cash, it is stated over the signature of "Jim" that he is speaking for "my Headquarters" and wants "to continue our mutual cooperation." That "Jim" is acting in a significant capacity is also demonstrated by his writing in the same document to the effect that he and his "Headquarters" "are also interested in significant secret plans and reports" and matters "carried on at your base." "Jim" adds that "[w]e will pay for such documents sufficiently more compared to the material received from you earlier, provided they are new and have an appropriate classification." Perhaps even of greater significance, "Jim" next discloses in this letter that "we are studying" arranging "a personal meeting with you overseas," probably in Austria. "Jim" then purports to be able to convey to the source "some advice concerning your security." With respect to the Austria meeting, "Jim" then advises that the source should "not go to Austria direct" but rather go through other countries such as Spain, West Germany or Switzerland.

Relative to the Austria meeting, "Jim" was also in a position to state in the same letter that if the source was not able to go to Austria, there would be no need for "the operation in June." Instead, "Jim" set the "next operation" for August. The letter also contains dates of meetings not only in August but in October and December, with alternate dates given as well.

Enger's close connection to the letter may be reasonably inferred from his activities as witnessed by the agents.

Turning to Chernyayev, and the obvious necessity for his constant presence, taking the averments of the affidavits as true, his role was almost as significant as Enger's (again assuming that, on several occasions, Enger used the name "Jim"). In addition to the numerous sightings which I had adverted to in my earlier opinion, we need only turn to the allegations of the affidavits related to the May 20, 1978 transaction. The transaction required two people. The affidavits detail the role ascribed to Enger, a role already discussed by me. Someone had to place the whipped cream container at the southeast corner of the A & P building shortly before the 2 p. m. telephone call was made, since, if engaged in the illegal activity charged by the United States, the defendants could not risk having the whipped cream container stand exposed to any passersby too long. Significantly, it was not Zinyakin but Chernyayev who placed the box at the corner. Equally significant, it was Chernyayev and not Zinyakin who drove off in his own automobile to the dropsite and, as reasonably may be inferred from the sighting of Chernyayev at the dropsite, who left the "Bartlett Pears" can there just minutes before the source, following the instructions in the whipped cream container left by Chernyayev, arrived to retrieve the "Bartlett Pears" can,

depositing at the same place the Tropicana container.[7]

Given the foregoing facts and circumstances as they now appear, I am satisfied that the earlier determination, granting defendants' motion to suppress under Fed.R.Cr.P. 41(f), should be vacated and the defendants' motion denied.

The analysis starts once again with the diplomatic immunity statutes (22 U.S.C. §§ 252 and 253) and the Vienna Convention.

Sections 252 and 253, enacted April 30, 1790 (1 Stat. 117), were derived from the English Diplomatic Privilege Act of 1708 (7 Ann. c. 12). *See* W. Blackstone, *Commentaries on the Laws of England,* 256 (Andrews ed. 1899). Section 3 of that Act rendered void "all writs and processes" for the arrest of a qualified diplomat or for the distraint, seizure, or attachment of his "goods or chat-

tels." [8] Section 4 made all violations of Section 3 a crime.[9] These provisions, which remained in force in Great Britain until 1964 (Diplomatic Privileges Act 1964, c. 18) were construed to apply only to civil, not criminal, process. 7 *British Digest of International Law* 756 (C. Parry ed. 1965). The partial immunity from criminal process enjoyed by diplomats in Great Britain prior to 1964 was based on common law. *Id.* at 756–63.

In 1790 the first Congress passed 1 Stat. 117. Section 25 of that statute rendered void any writ or process for the arrest or imprisonment of a diplomat or for the distraint, seizure, or attachment of his "goods or chattels"; [10] § 26 of that Act made violations of § 25 a crime punishable by not more than three years' imprisonment; [11] and § 28, a provision without a counterpart in the British act, made it a crime, among

7. This same meticulous preparation and concern with split-second timing were manifested on all other contacts, as well. *See* e. g., G–403, para. B.

8. 7 Ann. c. 12, § 3 in the original provided in relevant part:

that all writs and processes that shall at any time hereafter be sued forth or prosecuted whereby the person of any ambassador or other publick minister of any foreign prince or state authorized and received as such by her Majesty her heirs or successors or the domestick or domestick servant of any such ambassador or other publick minister may be arrested or imprisoned or his or their goods or chattels may be distrained seized or attached shall be deemed and adjudged to be utterly null and void to all intents constructions and purposes whatsoever.

9. 7 Ann. c. 12, § 4 in the original provided in relevant part:

And . . . in case any person or persons shall presume to sue forth or prosecute any such writ or process such person and persons and all attorneys and sollicitors prosecuting and solliciting in such case and all officers executing any such writ or process being thereof convicted by the confession of the party or by the oath of one or more credible witness or witnesses before the lord chancellor or lord keeper of the great seal of Great Britain the chief justice of the Court of Queens Bench the chief justice of the Court of Common Pleas for the time being or any two of them shall be deemed violaters of the laws of nations and disturbers of the publick repose and shall suffer such pains [penalties

and corporal punishment] as the [said] lord chancellor lord keeper and the said chief justices or any two of them shall judge fit to be imposed and inflicted.

10. Act of April 30, 1790, c. 9, § 25 provided:

*And be it [further] enacted,* That if any writ or process shall at any time hereafter be sued forth or prosecuted by any person or persons, in any of the courts of the United States, or in any of the courts of a particular state, or by any judge or justice therein respectively, whereby the person of any ambassador or other public minister of any foreign prince or state, authorized and received as such by the President of the United States, or any domestic or domestic servant of any such ambassador or other public minister, may be arrested or imprisoned, or his or their goods or chattels be distrained, seized or attached, such writ or process shall be deemed and adjudged to be utterly null and void to all intents, construction and purposes whatsoever.

11. Act of April 30, 1790, c. 19, § 26, provided:

*And be it [further] enacted,* That in case any person or persons shall sue forth or prosecute any such writ or process, such person or persons, and all attorneys or solicitors prosecuting or soliciting in such case, and all officers executing any such writ or process, being thereof convicted, shall be deemed violaters of the laws of nations, and disturbers of the public repose, and imprisoned not exceeding three years, and fined at the discretion of the court.

other things, to "assault," "strike," "wound," or "imprison" a diplomat.[12]

Although §§ 25 and 26 were modeled on the British Act and despite the absence of any indication in the legislative history that the American provisions were intended to have a meaning different from that of their British predecessor,[13] an early American case construed § 26 to apply to criminal process. *United States v. Benner,* 24 Fed. Cas. 1084 (No. 14,568) (C.C.E.D.Pa.1830).

The aforesaid three sections of the 1790 act have been carried forward, with only minor changes, to the present day: § 25 has become 22 U.S.C. § 252;[14] § 26 has become 22 U.S.C. § 253;[15] and § 28 has become 18 U.S.C. § 112(a).[16]

■ The Tropicana carton and the film therein, I find, were not Zinyakin's "goods or chattels" [*see* Black's Law Dictionary (Third ed.) and 38 C.J.S. 942] within the meaning of § 252. Again accepting as true for purposes of this motion the facts before

me, they reasonably lead to the conclusion that Zinyakin knew that the information in the Tropicana carton was national defense information related to the security of the United States obtained through violation of the laws of the United States and hence property which he intended to steal.

■ Having just picked it up from the "drop," he was carrying it to Enger's automobile, there presumably to deliver it to Enger, who, it appears, was in charge of the operation. Indeed, had the agents waited until Zinyakin delivered the package to Enger, or placed it in Enger's automobile in full view of the agents, seizure of the carton could have been made incident to Enger's arrest and no right of Enger's, fourth amendment or otherwise, would have been violated.[17] This is because the agents had a lawful arrest warrant for Enger's arrest and a limited automobile search, then and there, to retrieve the carton would have been justified, since, as Mr. Pass' affidavit now reveals, the carton was in plain view of

---

**12.** Act of April 30, 1790, c. 19, § 28, provided:
 *And be it [further] enacted,* That if any person shall violate any safe-conduct or passport duly obtained and issued under the authority of the United States, or shall assault, strike, wound, imprison, or in any other manner infract the law of nations, by offering violence to the person of an ambassador or other public minister, such person so offending, on conviction, shall be imprisoned not exceeding three years, and fined at the discretion of the court.

**13.** The legislative history of the Act of April 30, 1790 c. 9, 1 Stat. 117, contains no references to the portions of the Act concerning diplomatic immunity. For the Senate debates, see 1 Annals of Cong. 940–41 (1790). For the debates in the House of Representatives, see 1 Annals of Cong. 1520–21 (1790).

**14.** Whenever any writ or process is sued out or prosecuted by any person in any court of the United States, or of a State, or by any judge or justice, whereby the person of any ambassador or public minister of any foreign prince or State, authorized and received as such by the President, or any domestic or domestic servant of any such minister, is arrested or imprisoned, or his goods or chattels are distrained, seized, or attached, such writ or process shall be deemed void.

**15.** Whenever any writ or process is sued out in violation of section 252 of this title, every person by whom the same is obtained or prose-

cuted, whether as party or as attorney or solicitor, and every officer concerned in executing it, shall be deemed a violator of the laws of nations and a disturber of the public repose, and shall be imprisoned for not more than three years, and fined at the discretion of the court.

**16.** 18 U.S.C. § 112(a) provides:
 Whoever assaults, strikes, wounds, imprisons, or offers violence to a foreign official, official guest, or internationally protected person or makes any other violent attack upon the person or liberty of such person, or, if likely to endanger his person or liberty, makes a violent attack upon his official premises, private accommodation, or means of transport or attempts to commit any of the foregoing shall be fined not more than $5,000 or imprisoned not more than three years, or both. Whoever in the commission of any such act uses a deadly or dangerous weapon shall be fined not more than $10,000 or imprisoned not more than ten years, or both. The terms "foreign official" and "internationally protected person" within the meaning of 18 U.S.C. § 112(a) includes all persons entitled to diplomatic immunity. 18 U.S.C. §§ 112(c), 1116(b)(3) and (4).

**17.** Neither Enger nor Chernyayev has diplomatic immunity, as I have previously held.

the agents at all times after Zinyakin picked it up and carried it toward Enger's automobile. On the other hand, under the circumstances they were confronted with then and there, it cannot be said the agents acted unreasonably.

Since 1790 the statutes which today are §§ 252 and 253 have undergone sparse judicial interpretation. Such as there has been does not bear upon the issue here, that is, the meaning Congress intended to be given to the phrase "his goods or chattels."[18]

Two fruitful sources of international law for the draftsmen of the 1790 Act were the writings of Hugo Grotius and Emerlich de Vattel. *See* F. Ruddy, *International Law in the Enlightenment: The Background of Emerlich de Vattel's Droit Des Gens,* 281–84 (1975). Grotius, discussing the immunity conferred upon a diplomat's personal belongings, wrote:

> In respect to the personal property of an ambassador which is to be considered as an incident to this person, it cannot be attached, nor taken in execution, neither for the payment, nor for the security of a debt, neither by the ordinary process of a court of justice, nor by the extraordinary interposition of the local sovereign: such, in my opinion, is the best founded doctrine. For an ambassador, in order to enjoy complete security, ought to be exempt from all constraint, in respect to his person and those things which are necessary to him.

H. Grotius, *The Rights of War and Peace,* Bk. II, chapter 18, section 9. Similarly, Vattel wrote:

> [A] foreign minister, as we have already shown, is independent of the juris-diction of the country; and his personal independence in civil cases would be of little avail, unless it extended to every thing which he finds necessary in order to enable him to live with dignity, and quietly to attend to the discharge of his functions. Besides, whatever he has brought with him, or purchased for his own use as minister, is so connected with his person as to partake of the same fate with it. Since the minister entered the territory on the footing of independence, he could not have it in contemplation to subject his retinue, his baggage, or his necessaries, to the jurisdiction of the country. Every thing, therefore, which directly belongs to his person in the character of a public minister,—every thing which is intended for his use, or which serves for his own maintenance and that of his household,—every thing of that kind, I say, partakes of the minister's independency, and is absolutely exempt from all jurisdiction in the country. Those things, together with the person to whom they belong, are considered as being out of the country.

E. Vattel, *The Law of Nations,* 491–92 (Chitty ed. 1817).[19] *See also* H. Hallek, *International Law* 226 (1861).

Vattel's statement quoted above is given added meaning by the following view he expressed regarding a diplomat who offends the hospitality of the receiving nation (Vattel, *supra* at 476–78):

> Shall an ambassador be suffered with impunity to cabal against the state where he resides, to plot its ruin, to sir up the subjects to revolt, and boldly foment the

---

**18.** The two English cases cited by the defendants are not helpful. The Amazone, 5 P.D. 40 (1940), simply held that "possession" sufficed to trigger diplomatic immunity; title was unnecessary. *Compania Naviera Vascongada v. Steamship Cristina,* 1 AER 719 (1938) dealt with sovereign immunity. *Cf.* The Navemar, 303 U.S. 68 (1938); *and see* Restatement, Second, Foreign Relations Law of the United States § 68.

The defendants are correct in stating that "possession" is enough to support a diplomatic immunity claim. *See* IV Hackworth, Digest of International Law, 517–18 (1942 ed.). However, a thief does not have "possession."

**19.** Vattel is frequently cited by the courts in the early cases on diplomatic immunity. *United States v. Benner,* 24 F.Cas. 1084, 1085, 1088 (No. 14,568) (C.C.E.D.Pa.1830); *United States v. Ortega,* 27 F.Cas. 359, 360 (No. 15, 971) (C.C.E.D.Pa.1825); *United States v. Hand,* 26 F.Cas. 103, (104–05 (No. 15, 297) (C.C.D.Pa. 1810); *United States v. Liddle,* 26 F.Cas. 936, 937 (No. 15, 598) (C.C.D.Pa.1808); *Ex parte Cabrera,* 4 F.Cas. 964, 965 (No. 2, 278) (C.C.D. Pa.1805).

most dangerous conspiracies, under the assurance of being supported by his master? If he behaves as an enemy, shall it not be allowable to treat him as such? The question admits not of a doubt with regard to an ambassador who proceeds to overt acts, who takes up arms and uses violence . . .

The question is more difficult with respect to an ambassador who, without proceeding to overt acts, broaches plots of a dangerous tendency,—who, by his occult machinations, excites the subjects to revolt, and who forms and encourages conspiracies against the sovereign or the state. Shall it be deemed unlawful to repress and inflict exemplary punishment on a traitor who abuses the sacred character with which he is invested, and who is himself the first to set the example of violating the law of nations?

We are justifiable in adopting against him every measure which the circumstances of the case may reasonably require for the purpose of defeating his machinations and averting the evil which he has plotted. If, in order to disconcert and prevent a conspiracy, it were necessary to arrest or even put to death an ambassador who animates and conducts it, I do not see why we should for a moment hesitate to take either of those steps,—not only because the safety of the state is supreme law, but also because, independent of that maxim, the ambassador's own deeds give us a perfect and particular right to proceed to such extremities.

I must conclude that Congress in 1790 shared the views expressed by Grotius and Vattel. Thus, its members would not have regarded national defense information stolen by a diplomat as protected from recapture by officers of the receiving nation.

I take it that it was not the intent of Congress that a "minister" or his "domestic or domestic servant," § 252, *supra,* could, for example, commit a robbery and flee from the bank with the cash, and complain that "his goods or chattels" were seized from him in violation of his diplomatic immunity when officers stopped him and took the stolen bills from his hands. A thief who has just stolen property and is compelled, at the scene of the crime, to return it to its owner has not been deprived of his property. As a thief, he has no interest in the property as against the rightful owner.[20] Zinyakin's role here is analogous to the bank robber. Accepting the government's submissions as true, Zinyakin would have to be characterized as a thief who cannot claim any interest in the illegally obtained national security information against its owner, the United States.[21]

Ascribing to Congress the intention not to override settled common law principles when it passed §§ 252 and 253, I now hold that Zinyakin could not validly claim that the Tropicana carton and its contents were "his." Thus, Zinyakin's rights under these statutes were not violated by the recapture from him of these materials. Moreover, to the extent the other items taken from him on May 20, 1978 were instrumentalities of espionage against the United States, they too are not "his goods or chattels" within the meaning of § 252.

The defendants also contend that the recapture of the carton and its contents violated Zinyakin's rights under the Vienna Convention. I shall now address that argument, noting that my analysis of it necessitates to a degree repetition of what is set forth under I, Opinion of August 8, 1978.

**20.** This proposition is so well settled as to require no elaborate citation of authority in its support. *See* 73 C.J.S. Property § 15, p. 210:

A person cannot acquire property by his own crime. Title to personal property fraudulently or feloniously obtained does not pass to a wrongdoer, where the wrongful act is a crime at common law; and where property has been obtained from the owner by such act, his unqualified ownership is not changed, and he may peaceably take it in whose hands he may find it. So, a thief can acquire no title to stolen property, and title to personal property cannot be acquired through theft or robbery. (footnotes omitted)

**21.** The fact that the United States made the film available to the source so that he might deliver it to the cache does not make Zinyakin less a thief under the circumstances.

The Vienna Convention entered into force for the United States on December 13, 1972.[22] Its detailed provisions, and the absence of language requiring implementing legislation, lead me to hold that it is a self-executing treaty. *See* Evans, *Self-Executing Treaties in the United States,* 30 Brit. Yearbook of International Law 178, 185 (1953), for a review of what makes a treaty self-executing.[23] Thus, upon entry into force, it at once became operative as domestic law of the United States. Accordingly, it has been stated:

> Thus, at present in the United States, there are two distinct standards—the 1790 statute and the Vienna Convention—for determining the scope and extent of diplomatic immunities which may be accorded foreign diplomatic missions and their personnel; and both standards are fully operative as U.S. domestic law. This anomaly has engendered some confusion since the 1790 statute in some instances clearly provides a much broader grant of diplomatic immunity than is required by the Vienna Convention. Confusion is often compounded by the uncertainty as to which of the two separate standards is applicable under any given set of circumstances.

Congressional Research Service, Library of Congress, *Diplomatic Immunity: Problems and Proposed Solutions,* June 22, 1977, at 10.

The Supremacy Clause does not distinguish between treaties and acts of Congress; therefore, conflicts between the two are resolved by the doctrine of implied repeal, with the later in time prevailing. In *Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888), the Supreme Court said:

> By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other; provided, always, the stipulation of the treaty on the subject is self-executing.

Counsel have not presented any decisions, nor have I discovered any, which discuss whether the Convention and §§ 252–253 are inconsistent. Study reveals, however, that while there are no direct conflicts, there are differences in the scope of immunities conferred by the statutes and the Convention.

Thus, for example, an ambassador, who under § 252 cannot be sued under any circumstances, under Article 31 of the Convention may be sued in connection with his participation in any professional or commercial activities not within his official duties, or his ownership of private real property. This is so because, significantly, the Convention adopts the modern basis of diplomatic immunity, the "functional necessity theory," which justifies the grant of privileges and immunities only to the extent necessary to enable a mission to perform its function in representing the sending State, thus furnishing a guide to its interpretation.

The statute, it can thus be said, provides a much broader grant of immunity, both

---

**22.** The following are significant dates in the history of the Vienna Convention insofar as the United States is concerned:

Opened for signatures at Vienna, April 18, 1961;

Ratification advised by the Senate of the United States of America September 14, 1965;

Ratified by the President of the United States of America November 8, 1972;

Ratification of the United States of America deposited with the Secretary-General of the United Nations November 13, 1972;

Proclaimed by the President of the United States of America November 24, 1972;

Entered into force with respect to the United States of America December 13, 1972.

**23.** I thus reject the position of the United States that the Vienna Convention is not self-executing.

with respect to exemption from local jurisdiction and the categories of persons covered. Also significant is that Article 47(2)(b) of the Convention permits States by custom or agreement to extend to each other more favorable treatment than is required by the provisions of the Convention.

The incongruence between the statute and the Convention has led to a strong movement by both the executive branch and a substantial number of legislators for the enactment of legislation which would repeal §§ 252–254 and achieve conformity between the international and domestic legal standards on diplomatic immunity by establishing the Vienna Convention as the primary basis, if not the only basis, for extending privileges and immunities to foreign diplomatic missions and their personnel. Indeed, it appears that such legislation has now passed both houses of Congress and will shortly be referred to conference.[24]

Given this background, it is fitting that defendants' contention that Zinyakin's diplomatic immunity was violated on May 20, 1978 now be tested against the Vienna Convention.

The introductory language of the Convention sets forth its objectives:

> The States Parties to the present Convention,

> *Recalling* that peoples of all nations from ancient times have recognized the status of diplomatic agents,

> *Having in mind* the purposes and principles of the Charter of the United Nations concerning the sovereign equality of States, *the maintenance of international peace and security, and the promotion of friendly relations among nations,*

> *Believing* that an international convention on diplomatic intercourse, privileges and immunities would contribute to the development of *friendly relations among nations,* irrespective of their differing constitutional and social systems,

> *Realizing* that the purpose of such privileges and immunities is not to benefit individuals but *to ensure the efficient performance of the functions of diplomatic missions as representing States,*

> *Affirming* that the rules of customary international law should continue to govern questions not expressly regulated by the provisions of the present Convention,

> *Have agreed* as follows: (emphasis supplied)

*Comment:*

It is stated with clarity and force, at the outset, that the Convention is intended to protect diplomats in order that "international peace and security, and the promotion of friendly relations among nations" is advanced. The ultimate objective, therefore, is not that a particular diplomat be cloaked with immunity for any act he commits; it is to further warm relations between states. At once the thought occurs— is it contemplated that a diplomat should by his conduct destroy that which the grant of immunity is intended to advance? The answer would seem to be a flat "No."

### Article 3

1. The functions of a diplomatic mission consist *inter alia* in:

(a) representing the sending State in the receiving State;

(b) protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law;

(c) negotiating with the Government of the receiving State;

(d) *ascertaining by all lawful means conditions and developments in the receiving State,* and reporting thereon to the Government of the sending State;

---

24. H.R. 7819, "The Diplomatic Relations Act of 1978"; *and see* S.Rep. No. 95–958, 95th Cong., 2d Sess. (1978) U.S.Code Cong. & Admin.News, p. 1935. *See also* Hearings before Subcommittee on International Relations, House Committee on International Relations, H.R. 1536, 3841, and 6133, 95th Cong., 1st Sess. (1977).

**544**

(e) *promoting friendly relations between the sending State and the receiving State,* and developing their economic, cultural and scientific relations.

2. Nothing in the present Convention shall be construed as preventing the performance of consular functions by a diplomatic mission. (emphasis supplied)

*Comment:*

 As to Article 3 little need be said once the underscored portions are read. Given the unrefuted submissions of the United States, which I must accept as true, Zinyakin was acting as a spy on May 20, 1978 and not using "lawful means" to ascertain "conditions and developments" in the United States; and it certainly cannot be said he was engaged in "promoting friendly relations between . . . [the U.S.S.R.] and the . . . [United States]."

### Article 29

The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity.

I have been shown nothing to indicate that by its adhering to the Vienna Convention the United States intended to broaden the scope of diplomatic immunity accorded to the "goods or chattels" of a diplomatic agent or to his person. Indeed, it is in part because the 1790 Act is generally regarded as more generous to foreign diplomats sent to the United States than are the laws of other nations to diplomats of the United States, that the pressure to repeal §§ 252–254 has come about.

 In the absence of any case law, or other authority pointing in another direction, I must construe the language of Article 29 to be somewhat (but not totally) consistent with that of § 252. Thus, I interpret it to mean that where a diplomat has abused the hospitality of the receiving State by stealing from that State vital national defense documents, he can be required to return such materials to the receiving State. I cannot accept the premise that the law of nations contemplates that the receiving State must stand by helplessly while highly classified information is stolen from it by a diplomat who, logic tells us, has in mind transporting it to his own country, there perhaps to be used to destroy the receiving State.

 Accordingly, I perceive the situation to be the same whether the seizure from Zinyakin is measured by § 252 or the Vienna Convention, as regards the Tropicana carton and its contents. As to the other material and items seized, though they be items useful in espionage, as the United States contends, I apply the plain language of Article 29 and hold that their seizure violated that article.

As to so much of the seizure which I have found to be violative of Article 29, of what vitality and validity is my determination? The United States contends that a judicial determination to that effect is *ultra vires.* Second Supplemental Brief of the United States, 2–6. Thus it is argued that because Article 47[25] provides for flexibility in the application of the Convention, the "exercise" of such flexibility "is properly the function of the Executive Branch." *Id.* at 2. *See also* Sec. 4 of H.R. 7819, *supra,* at 512.

**25.** Article 47 of the Vienna Convention provides:
1. In the application of the provisions of the present Convention, the receiving State shall not discriminate as between States.
2. However, discrimination shall not be regarded as taking place:
(a) where the receiving State applies any of the provisions of the present Convention restrictively because of a restrictive application of that provision to its mission in the sending State;
(b) where by custom or agreement States extend to each other more favourable treatment than is required by the provisions of the present Convention.

The argument then continues (Second Supplemental Brief of the United States at 6):

> Needless to say, the flexible exercise of reciprocity is an important tool in conducting foreign policy; for example, short of breaking diplomatic relations, it is the only means the Executive has of protecting our diplomats in foreign nations. Any court decision . . . that has the effect of limiting the Executive's flexibility interferes with the Executive's ability to conduct foreign policy under accepted standards of international law.

■ While the contention of the United States has much merit, I must conclude that the judicial branch is not without a role in the interpretation of the provisions of the Convention and in determining whether diplomatic immunity granted by the Convention has been violated.

The balance of this opinion discusses the rights of the defendants to the extent Zinyakin's diplomatic immunity might have been violated.

a. Is there an exclusionary rule to be drawn from 22 U.S.C. §§ 252 and 253 and the Vienna Convention?

■ No exclusionary rule is explicated by §§ 252 or 253, or the Vienna Convention, and neither counsel has, nor have I, discovered any case law on the subject drawn from the decisions of any nation. I decline to infer such a rule from the Vienna Convention in the absence of a clear indication that the draftsmen of the Convention (and the executive branch of the United States at the time this nation became a signatory) intended to engraft such a rule on the statutes or the treaty.[26]

■ The defendants urge that to decline to bar evidence illegally seized demeans the judicial branch. This misstates the rationale of the exclusionary rule; it is founded upon the principle that exclusion of otherwise admissible evidence, which has been illegally obtained will deter illegal police activity in the future. *See Stone v. Powell,* 428 U.S. 465, 486, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *see also* Chief Justice Burger's dissent in *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 338, 411, 91 S.Ct. 1999, 29 L.Ed.2d 618 (1971) (hereinafter "Bivens").

Given the circumstances of this case, upon reconsideration of the matter, I conclude that it would be unwise for me to venture into what is essentially a legislative and executive concern, harmonizing the treatment to be accorded in the United States to violations of diplomatic immunity with the treatment of violations by other nations of the rights of diplomats of the United States.

This is particularly so in view of the increasing opinion reflecting concern over the efficacy of the exclusionary rule. *See* Comment, Standards for the Suppression of Evidence Under the Supreme Court's Supervisory Power, 62 Corn.L.Rev. 364 (1977);[27] *United States v. Calandra, supra; Bivens, supra,* 403 U.S. at 411, 91 S.Ct.

---

**26.** The absence of any authority on the subject is not surprising. The exclusionary rule, as I shall demonstrate, may be invoked only by one whose rights have been violated, when he is thereafter prosecuted. The diplomat of course cannot be prosecuted. Thus he has no need to invoke the exclusionary rule.

Moreover, a judicial application of the exclusionary rule in an area so pervaded by legislative and executive interests, foreign affairs, would be unwise when the rule cannot be said to be of universal application in the nations of the world or, in the case of the Convention, in the 122 signatory nations. *See* The Historical and Philosophical Foundations of the Exclusionary Rule, 12 Tulsa L.J. 323 (1976):

> Of all the major civil and common law countries, the United States is the only nation that has developed a comprehensive exclusionary rule. Other common law jurisdictions have generally followed the traditional English view of admitting all evidence, regardless of whether it has been obtained in an illegal search and seizure.

*See also* The Exclusionary Rule Under Foreign Law, 52 J.Crim.L. etc. 271 (1961).

**27.** As this author points out, there is substantial reason to doubt the underlying premise of deterrence is sound.

1999; Chief Justice Burger dissenting in part and concurring in part in *Coolidge v. New Hampshire,* 403 U.S. 443, 492, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Moreover, it is arguable that Congress, in the enactment of § 253, provided its own deterrent to violations of § 252, by making such a crime.[28]

Finally, there are substantial policy reasons for not applying the exclusionary rule where, as here, Zinyakin was offending the hospitality of the receiving State, in violation of the Vienna Convention, by engaging in espionage activities and the materials were taken from him without, as far as I am advised, undue force used upon him. In short, the agents acted reasonably to protect the security of their country. *See United States v. Liddle,* 26 F.Cas. 936 (No. 15,598) (C.C.D.Pa.1808), where it was held that a prior assault by a foreign diplomat would excuse a battery upon him in self-defense.

b. Assuming an exclusionary rule were to be judicially fashioned, should it be applied to the defendants' motion?

■ This question raises what the parties have addressed as an issue of standing. In view of the full presentation now before me, I conclude that, even if I were to create an exclusionary rule for violation of diplomatic immunity, it would not serve the interests of these defendants.

Since it is Zinyakin's diplomatic immunity which defendants claim was violated, and not his fourth amendment rights, there can be no valid fourth amendment claim of any kind made by the defendants with respect to the Tropicana carton, since their own fourth amendment rights were not violated.[29]

The defendants invoke the "automatic standing" rule, *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), to resolve what is actually not a question of fourth amendment law.

■ I am now convinced, in the face of all that is before me, that I must, upon reconsideration of the matter, deny defendants standing to raise, by a motion to suppress, any assumed violation of Zinyakin's diplomatic immunity.

■ Reasoning from *Jones,* the better to understand "automatic standing," it is given only to those whose *own* fourth amendment rights have been violated. *Jones, supra* at 261, 80 S.Ct. 725. Thus, had Zinyakin's fourth amendment rights been abridged, defendants, charged with a possessory offense, would have been accorded automatic standing so that they could then assert invasion of their *own* fourth amendment rights, without surrendering their fifth amendment right by admitting their possession. They would not be aggrieved if they stood only on Zinyakin's fourth amendment rights (had they been violated), as is made clear by the Supreme Court in *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). There, each of the defendants, in the cases decided under *Alderman,* argued that he was entitled to a retrial if any evidence used to convict him was the result of unauthorized surveillance, regardless of whose fourth amendment rights were violated. It was also argued that if any evidence was inadmissible

---

**28.** *See also* Fed.R.Evid. 402:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

Omitted from the sources of the exceptions stated in Rule 402 are "treaties." *Cf.* Art. VI, cl. 2 of the United States Constitution.

**29.** Zinyakin's fourth amendment rights were not violated by the seizure. The federal agents had probable cause to believe Zinyakin was committing a crime against the United States. Thus he could have been arrested without violating his rights under the fourth amendment since an arrest warrant is not needed to make a felony arrest based upon probable cause. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). The seizure of the entire paper bag could then have been justified as a search incident to a lawful arrest. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Moreover, it now appears, from the recent government submissions, that the Tropicana carton was "in plain view" at all times while being held by Zinyakin.

against one defendant or conspirator because tainted by electronic surveillance illegal as to him, it was also inadmissible against his codefendant or co-conspirator. Commenting upon these contentions, the Court stated (394 U.S. at 171–72, 89 S.Ct. at 965);

> The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. . . .

The Court then added (394 U.S. at 174, 89 S.Ct. at 966):

> We adhere to these cases and to the general rule that Fourth Amendment rights are personal rights which . . . may not be vicariously asserted. . . .

Since the defendants themselves do not enjoy diplomatic immunity, they must stand on a violation of Zinyakin's. This they cannot do.

In my opinion of August 8, 1978 I rested a finding of defendants' "standing" on Counts I and III of the indictment on *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). It is clear, under the circumstances as they now appear, that the defendants can derive no comfort from *Brown,* and I so hold.

Thus, for the foregoing reasons, the motion of the United States for reconsideration of my decision suppressing the materials seized from Zinyakin by the agents is granted and upon reconsideration I deny the motion to suppress.